IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| RYAN E. MILLER, individually, | ) | No. 68594-5-I |
| | ) | |
| Respondent/ | ) | |
| Cross-Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| PATRICK J. KENNY, individually, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | PUBLISHED OPINION |
| and | ) | |
| | ) | FILED: April 28, 2014 |
| SAFECO INSURANCE COMPANY, | ) | |
| | ) | |
| Appellant/ | ) | |
| Cross-Respondent. | ) | |

BECKER, J. — In an insurance bad faith case, the amount of a reasonable covenant judgment sets a floor, not a ceiling, on the damages a jury may award. We affirm a jury verdict awarding $13 million in damages to the assignee of the bad faith causes of action where the total net amount of the covenant judgment was $4.15 million.

This appeal arose out of an automobile accident on August 23, 2000. Patrick Kenny, the driver at fault, was driving a 1994 Volkswagen Passat in Alberta, Canada, when he rear-ended a cement truck. The accident injured his three passengers: Ryan Miller, Ashley Bethards, and Cassandra Peterson. The

four teenagers were close friends who had attended Anacortes High School and were taking a road trip before starting college at the University of Washington.

The Passat belonged to Cassandra Peterson. Kenny had permission to drive it and was covered for liability under the car insurance policy issued to Peterson's parents by appellant Safeco Insurance Company. Within days of the accident, Safeco had information that the injuries were severe. Safeco defended Kenny without a reservation of rights.

Miller, who had experienced a head injury and was unable to start college as planned, eventually retained counsel. As a preliminary to initiating settlement discussions, Miller contacted Safeco in October 2001 to inquire about the policy limits. Safeco did not divulge the policy limits, claiming that the Petersons had not given their permission—a point that would later be disputed at trial. Miller forced the issue by filing suit against Kenny on December 20, 2001. This made the policy limits discoverable.

In January 2002, Safeco disclosed that the Petersons had liability policy limits of $500,000 per person and per accident, and umbrella policy limits of $1 million. The policy also had underinsured motorist (UIM) coverage that was potentially available to the injured passengers. Safeco represented that the limits of the UIM coverage were only $100,000 due to an alleged prior rejection by Peterson's mother of UIM limits of $500,000.

On July 1, 2002, Miller sent Safeco a letter demanding a policy limits settlement. The letter called attention to the "substantial" risk of an excess

judgment.[1] Peterson had already sent Safeco a settlement demand for $350,000. Shortly thereafter, Safeco received a demand of $1.25 million from Bethards, who had suffered a head injury.

On August 29, 2002, Kenny's appointed defense counsel Vickie Norris wrote to the Safeco adjuster, pointing out that the cumulative settlement demands exceeded the policy limits. On behalf of Kenny, Norris demanded that Safeco tender the policy limits into the registry of the court in exchange for a release and hold harmless from the claimants.[2]

Safeco's adjuster responded by letter saying that with the information received so far, "we do not see the combined value of the injuries in excess of the policy limits."[3] The adjuster tendered to Norris only the $500,000 in liability limits.

On November 8, 2002, Norris wrote to the three claimants on behalf of Kenny, tendering to them the $500,000 she had received from Safeco pending agreement by the claimants on how to divide it. She offered that Kenny would assign "any bad faith claims that he may have against Safeco" in exchange for the claimants' agreement not to execute or enforce above all available policy limits.[4]

The trial date for Miller's suit against Kenny was set for June 2003. In March 2003, Safeco authorized Norris to tender the umbrella policy limits of $1

---

[1] Exhibit 125.
[2] Exhibit 143; Clerk's Papers at 675.
[3] Clerk's Papers at 676.
[4] Exhibit 155.

3

million, to be added to the $500,000 in liability limits, in exchange for a release of all claims against their insureds.[5] This offer came too late. Kenny was facing the likelihood of an excess judgment at the upcoming trial. Kenny acted upon advice from Norris and retained attorney Jan Peterson to attempt to negotiate a global settlement with the three passengers.

The settlement agreement was achieved in May 2003.[6] Kenny had $1.8 million of insurance proceeds available ($300,000 from his parents' State Farm policy in addition to the $1.5 million from the Petersons' Safeco policy). Kenny agreed to pay the $1.8 million to Miller, Bethards, and Peterson, through the mechanism of a partial judgment if necessary, and to assign to Miller his rights to sue Safeco for bad faith and related claims or actions. In return, the three claimants granted Kenny a covenant not to execute on or enforce any excess judgment. It was agreed that the full amount of damages for the covenant judgment would be determined by stipulation or arbitration, contingent upon a reasonableness finding by the court.

Safeco intervened after being notified of the settlement agreement. A reasonableness hearing became unnecessary when Safeco, in May 2005, stipulated to an order finding that $4.15 million was the reasonable total net amount for the stipulated covenant judgments.[7] This was the amount of damages that remained unpaid after the three passengers received the $1.8 million in insurance proceeds. All parties to the stipulated order agreed to treat

---

[5] Clerk's Papers at 5896.
[6] Exhibit 1; Clerk's Papers at 5828-5838.
[7] Exhibit 15.

4

the remaining $4.15 million as if judgment in that amount had been entered against Kenny. The order allocated the damages as follows:

| Claimant | Gross Amount | Net Amount |
| --- | --- | --- |
| Miller | $3,450,000 | $2,575,000 |
| Bethards | $2,100,000 | $1,425,000 |
| Peterson | $ 400,000 | $ 150,000[8] |

Safeco's stipulation reserved its defenses in future litigation. Thus, the stage was set for bad faith litigation. Miller dropped his claims against Kenny. As Kenny's assignee, he amended his complaint to allege bad faith against Safeco, as well as negligence, consumer protection violations, breach of contract, and other theories. Miller alleged that Safeco had damaged Kenny by refusing to disclose the liability policy limits, thereby forcing the initiation of Miller's lawsuit against Kenny, and by its subsequent actions in handling the case. Miller also sued as the assignee of Cassandra Peterson's claim that Safeco committed bad faith when it represented that her parents' policy provided only $100,000 in UIM coverage for the Passat instead of $500,000.

Years of litigation followed. Miller's major theme was that Safeco could have protected Kenny from exposure to an excess judgment by promoting a policy limits settlement much earlier. Safeco's principal defense was that it never had a genuine opportunity to settle the case because there were three claimants, and Miller unreasonably and intransigently demanded all the policy limits for himself. This dispute about who was to blame for the lack of settlement continued to the last witness on the last day of trial, a Safeco adjuster whose deposition was presented in Miller's rebuttal

---

[8] Exhibit 15; Clerk's Papers at 5898.

5

case. The adjuster admitted that Safeco's failure to offer $1.5 million in August 2002 was not due to the position taken by the lawyers, but rather was due to Safeco's assessment at the time that the three claims did not approach $1.5 million in value.

Safeco erected a secondary line of defense upon the terms of the settlement agreement. Safeco argued that Kenny had failed to make a valid assignment of his right to sue Safeco for bad faith. In the 2003 agreement with his passengers, Kenny assigned to Miller "all rights, privileges, claims and causes of action that he may have" against Safeco. At the same time, Kenny reserved to himself certain "claims for damages."

> c. **Reservation:** Defendant Kenny hereby reserves to himself claims for damages for his personal emotional distress, personal attorneys' fees, personal damages to his credit or reputation and other non-economic damages which arise from the assigned causes of action.[9]

Safeco argued that because of Kenny's reservation of his "claims" for personal damages, Miller as Kenny's assignee could not prove harm, an essential element in a bad faith case. On December 22, 2008, Safeco moved for dismissal on summary judgment on this basis.

The trial court denied the motion for summary judgment. This court took discretionary review and decided that summary judgment was properly denied because what Miller and Kenny intended by the assignment and reservation provisions of the agreement depended on the resolution of disputed extrinsic evidence. Miller v. Kenny, noted at 158 Wn. App. 1049, 2010 WL 4923873, at *7.

---

[9] Exhibit 1.

When the case returned to superior court, Safeco moved to bifurcate the trial. The trial court granted the motion. The jury would proceed to decide Safeco's liability for bad faith only if the jury determined in the first phase that the May 2003 settlement agreement was intended to permit Miller to recover Kenny's damages caused by Safeco's alleged bad faith.

The first phase of trial began November 30, 2011. It was concerned solely with contract interpretation. Safeco's factual position was that the agreement reserved to Kenny the right to pursue damages. Safeco's legal theory was that if the jury found Kenny retained that right for himself, then the assignment was invalid because it was incomplete. Miller's position was that the agreement retained for Kenny only an interest in any damages Miller recovered and that Miller alone had the right to pursue Kenny's damages in a lawsuit against Safeco.

The question posed to the jury was "Who gets to pursue Kenny's claims for personal emotional distress, attorneys' fees, personal damage to credit and reputation, and other non-economic damage?" The verdict form gave the jury three possible ways to answer the question: Kenny, Miller, or both. The jury checked "Miller" in their verdict on December 2, 2011.[10] This verdict cleared the way for the second phase of the trial, Safeco's alleged liability for dealing with Kenny in bad faith.

The second phase of the trial began on December 5, 2011, before the

---

[10] Clerk's Papers at 5702 (verdict); Report of Proceedings (Dec. 2, 2011) at 110-11.

same jury. The trial court gave the jury 31 instructions.[11] Instruction 8 explained

the significance of the verdict in the first phase of trial:

> As a consequence of the first trial, Plaintiff Ryan Miller is the assignee of the rights, claims and causes of action of Patrick Kenny and Cassandra Peterson against Safeco.
>
> An assignee steps into the shoes of the assignor and has all of the rights of the assignors. The assignee's cause of action is direct, not derivative. The assignee may sue in his or her own name, and may speak in the place of the assignors.
>
> As a result, Ryan Miller is the real party in interest and has the exclusive right to recover all damages related to the assigned causes of action. Who he has agreed to share those damages with, and in what amounts, is not material to his right to recovery.[12]

The jury was instructed on bad faith, negligence, breach of contract, and

consumer protection. Instruction 25 set forth standards pertinent to the central

claim of bad faith:

> The duty of good faith requires an insurer to:
> (1) Perform a reasonable investigation and evaluation of a claim against its insured;
> (2) If its investigation discloses a reasonable likelihood that its insured may be liable, make a good faith effort to settle the claim. This includes an obligation at least to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available and make an informed evaluation of the settlement demand;
> (3) Evaluate settlement offers as though it bore the entire risk, including the risk of any judgment in excess of the policy limits;
> (4) Timely communicate its investigations and evaluations, and any settlement offers, to its insured; and
> (5) If the settlement demand exceeds the insurer's policy limits, communicate the offer to its insured, ascertain whether the insured is willing to make the necessary contribution to the settlement amount, and exercise good faith in deciding whether to pay its own limits.
>
> An insurer who fails to fulfill any of these duties fails to act in good faith.

---

[11] Clerk's Papers at 5373-5409.
[12] Clerk's Papers at 5383.

On December 16, the jury returned a plaintiff's verdict of $13 million.[13] Of this award, $11.9 million was on the assignment from Kenny and $1.1 million was on the assignment from Peterson.[14]

The judgments ultimately entered by the court against Safeco added prejudgment interest of more than $7 million, postjudgment interest at 12 percent, $1.7 million in attorney fees and costs, and treble damages under the Consumer Protection Act, chapter 19.86 RCW. The total was $21,837,286.73.

## INTERPRETATION OF THE SETTLEMENT AGREEMENT

In the first phase of the trial, the jury's verdict determined that the 2003 settlement agreement authorized Miller, and only Miller, to carry on the litigation against Safeco for Kenny's damages personal to himself. Safeco contends the trial court committed reversible error by allowing the jury to hear evidence of the subjective intent of the parties to the agreement.

Safeco's argument implicates the context rule of contract interpretation. Berg v. Hudesman, 115 Wn.2d 657, 801 P.2d 222 (1990); Hollis v. Garwall, Inc., 137 Wn.2d 683, 695, 974 P.2d 836 (1999). To determine the intention of the parties to a contract, the finder of fact may consider extrinsic evidence regarding the situation of the parties and the circumstances under which the contract was executed. Berg, 115 Wn.2d at

---

[13] Clerk's Papers at 5410-5413.
[14] The components were $9.65 million for Kenny's claim for bad faith; $750,000 for each of Kenny's assigned consumer protection, negligence, and contract claims ($9.65M + ($750,000 x 3 = $2.25 million) = $11.9 million); $350,000 for Cassandra Peterson's assigned bad faith claim; and $250,000 for each of her assigned consumer protection, negligence, and contract claims ($350,000 + ($250,000 x 3 = $750,000) = $1.1 million).

669. Admissible extrinsic evidence does not include "evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term." Hollis, 137 Wn.2d at 695; Ross v. Bennett, 148 Wn. App. 40, 46, 203 P.3d 383 (2008), review denied, 166 Wn.2d 1012 (2009). The subjective intent of a party is generally irrelevant to the interpretation of a contract if the intent of the instrument can be determined from the actual words used. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005).

The phase one trial lasted two days. It began with opening statements on the afternoon of November 30, 2011. Most of the evidence came in through Miller's first witness, attorney Jan Peterson, who represented Kenny in the negotiations that produced the settlement agreement. Peterson was the drafter of the agreement.

On direct examination, Peterson described Kenny's situation in the spring of 2003 as the trial of Miller's personal injury suit drew near. Peterson testified that because of Safeco's failure to seek out an early settlement, Kenny faced the likelihood of an excess judgment at the upcoming trial. He also testified that one of Safeco's attorneys had threatened to withdraw Kenny's coverage if Kenny assigned his bad faith claims to Miller.

Peterson was asked what he intended in drafting certain parts of the settlement agreement, including the assignment and reservation provisions. Safeco objected that "personal intentions are irrelevant." The trial court ruled that "Mr. Peterson can testify as to what he did and why he did it." Peterson answered that the purpose of the agreement was to protect Kenny from excess judgments and to preserve to Kenny "the options of recovering damages, personal to him." He testified without objection that the

10

structure of the agreement reflected the intent that Miller—not Kenny—would go forward with the assigned causes of action against Safeco.

Peterson was asked what he "meant for this document to speak" when he drafted the assignment and reservation provisions. This time, Safeco objected that Peterson's personal intentions were irrelevant unless they were communicated to Safeco. The trial court properly overruled the objection. As the testimony showed, Safeco was not a party to the agreement and had not been involved in negotiating it. The admissibility of a drafter's testimony does not depend upon communication with an entity not a party to the negotiations. Peterson answered that the assignment meant Miller had the right to bring the bad faith action, and Kenny did not have an obligation to bring a separate bad faith action.

On cross-examination, Safeco tried to elicit Peterson's agreement that the reservation clause meant Kenny had reserved the right to pursue his causes of action against Safeco. Peterson's answers distinguished between the causes of action, which he said Kenny had assigned, and the claims for damages, which he said Kenny had reserved. This distinction went to the ultimate issue the jury was being asked to decide. On redirect, Peterson repeated it without objection.

At the end of redirect, Peterson was asked to state his purpose in drafting the agreement. Was his purpose to allow Miller and Kenny to pursue the bad faith action together and share the recovery, or was it to allow each of them to pursue the bad faith claim independently at double the expense? Safeco objected: "The witness can't testify to his subjective purpose or intent. The document speaks for itself." The court ruled that Peterson "may testify as to what his intent was when he drafted the

11

document." Peterson answered that having Miller and Kenny each pursuing a bad faith action independently was "not what we wanted for Mr. Kenny."

After Peterson, Miller and Kenny testified briefly. The trial court sustained Safeco's objection when Kenny was asked about his intent. However, over objection, the court permitted Kenny to answer a question about "what [he] expected to occur with the settlement agreement." Kenny answered, "My expectation was that I was assigning a cause of action to Ryan Miller. After assigning that cause of action, if it was found that Safeco had acted in bad faith towards me, I would still be entitled to claim a portion of those damages." A similar question was asked soon after, and again the court overruled Safeco's objection:

> Q. Has there ever been any question in your mind as to the fact
> that, with the assignment that you provided, that Ryan Miller was entitled
> to have the right to sue Safeco in your behalf and recover all the damages
> and share those with you if there is a recovery?
> [Kenny:] No doubt.
> [Safeco]: Objection.
> THE COURT: Overruled.

The closing arguments reiterated the themes that emerged from Peterson's testimony. Miller emphasized the assignment language. He argued that the agreement made sense only if it was he, not Kenny, who had the right to pursue for both of them the personal damages that arose from the assigned causes of action. Safeco emphasized the reservation clause: Did Kenny assign everything or did he reserve certain damages unto himself? "If he reserved unto himself certain damages, it cannot be proved that Patrick Kenny assigned all."

The jury's verdict sided with Miller. The jury determined that Miller, and only Miller, was entitled to pursue Kenny's claims for personal damage.

12

On appeal, Safeco contends that Peterson and Kenny both provided evidence of subjective intent that should have been excluded under Hollis.

The line between permissible evidence of context and impermissible evidence of subjective intent is not bright. Under Hollis, evidence of a *party's* unilateral or subjective intent as to the meaning of a contract word or term is inadmissible. Hollis, 137 Wn.2d at 695. We have held that extrinsic evidence is admissible to show the intent of a *drafter* so long as it is not used to change the terms of an agreement. Saunders v. Meyers, 175 Wn. App. 427, 440, 306 P.3d 978 (2013). In another case, we have applied the Hollis prohibition to exclude evidence of the subjective intent of the drafter of a restrictive covenant. Ross, 148 Wn. App. at 47-48.

Although Peterson drafted the agreement and was not himself a party, some of Safeco's objections to questions asked of Peterson arguably could have been sustained under Ross. Yet Safeco allowed similar questions to go by without objection, and Safeco itself asked Peterson questions about what the agreement meant. We therefore decline to go through each ruling the trial court made and decide which ones, if any, were in error. "Admission of testimony that is otherwise excludable is not prejudicial error where similar testimony was admitted earlier without objection." Ashley v. Hall, 138 Wn.2d 151, 159, 978 P.2d 1055 (1999).

The trial court actively policed the questioning of the witnesses with the Hollis rule in mind ("[I]f the contract says blue, a person can't say but what I meant was not blue, I meant red.")[15] Even if some of the testimony went beyond supplying context for the agreement, the court did not permit the witnesses to read language into the

---

[15] Report of Proceedings (Dec. 1, 2011) at 130.

agreement that was not there. That is the essential concern of Hollis—to exclude extrinsic evidence that "would show an intention independent of the instrument" or "would vary, contradict or modify the written word." Hollis, 137 Wn.2d at 695.

Miller and Safeco offered competing interpretations of the agreement based on the ambiguity created by the assignment and reservation provisions. Their competing interpretations were both rooted in the written words of the agreement. Both parties properly focused on the key words of the agreement—"assignment," "reservation," "claim," and "cause of action." Miller did not ask the jury to interpret the agreement as including words not found in it. Cf. Seaborn Pile Driving Co., Inc. v. Glew, 132 Wn. App. 261, 270-71, 131 P.3d 910 (2006) ("although Seaborn may have intended the offer to include attorney fees, that intention was not expressed in the contract as written"), review denied, 158 Wn.2d 1027 (2007).

Safeco does contend that Kenny's testimony directly contradicted the written words of the reservation provision, in violation of Hollis. This argument fails because it assumes the result. This court's previous decision on discretionary review determined that the agreement had an ambiguity because Kenny assigned his causes of action and at the same time reserved claims for damages to himself. Thus, the reservation provision did not have an unambiguous meaning that Kenny's testimony could contradict. The point of the phase one trial was to find out what the reservation provision meant.

To the extent that testimony about intention and purpose was improperly admitted, we reject Safeco's argument that the error was prejudicial. An erroneous evidentiary decision is reversible error only if "it is reasonable to conclude that the trial

14

outcome would have been materially affected had the error not occurred." Lutz Tile, Inc. v. Krech, 136 Wn. App. 899, 905, 151 P.3d 219 (2007), review denied, 162 Wn.2d 1009 (2008).

Peterson was an important witness. His testimony was a tutorial on the pressures faced by an insured defendant when he has caused damage exceeding his policy limits and his insurer refuses to tender policy limits. Peterson's answers were typically more circumspect than the sometimes leading questions posed to him on direct and cross. Virtually everything he said was clearly admissible and highly relevant extrinsic evidence about the circumstances leading up to the agreement, the context in which the parties signed it, and their subsequent acts and conduct.

The interpretation proposed by Safeco was strained: that despite the assignment language, Kenny had reserved the right to bring his own bad faith suit against Safeco. The difficulty with Safeco's position was noted by this court on discretionary review: "Safeco's reading fails to harmonize the assignment and reservation provisions. It is neither logical nor reasonable that the parties would intend to assign 'all rights, privileges, claims and causes of action,' including the bad faith claim, and then defeat the assignment's purpose by retaining an essential element of the bad faith cause of action in the reservation provision." Miller, 2010 WL 4923873 at 6.

The reservation by Kenny of his "claims for damages . . . which arise from the assigned causes of action" was an unusual feature of the agreement, one we have not seen in similar cases. It is not surprising that Safeco challenged it. But it is also not surprising that the jury gave the agreement a realistic interpretation that would serve the interests of both Miller and Kenny given the situation they were in. Peterson educated

15

the jury about the legal and practical realities of the situation:  assignment of a bad faith claim permits a settling defendant like Kenny to escape from the burdens of litigation and liability while giving an injured plaintiff like Miller the opportunity to secure adequate compensation not otherwise available from the settling defendant.  Given the solidity of Peterson's testimony and the scarcity of countervailing evidence, we do not see a reasonable possibility that the outcome of the trial's first phase would have been different if the specific excerpts challenged by Safeco had been excluded.

Safeco raises a related claim of instructional error in phase one.  The trial court gave instruction 5, a pattern instruction on contract interpretation.  See WPI 301.05.  Drawn from Berg, the pattern instruction is appropriate for use "when the jury must decide the intended meaning of contract language."  6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS:  Civil 301.05 note on use at 204 (6th ed. 2012) (WPI).  Instruction 5 told jurors to

> determine the intent of the contracting parties by viewing the contract as a whole, considering the subject matter and apparent purpose of the contract, all the facts and circumstances leading up to and surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of the respective interpretations offered by the parties.

Safeco assigns error to the trial court's refusal to give, in addition, an instruction based on WPI 301.06.  As modified and proposed by Safeco, it read as follows:

16

If you find that all of the provisions of an agreement between Ryan Miller and Patrick Kenny are contained in the Settlement Agreement and Assignment of Rights, Judgment and Covenant ("the Settlement Agreement"), and that the Settlement Agreement was intended by all parties as their final agreement on the subjects addressed in it, then you may not consider evidence outside the written document to add to, subtract from, vary, or contradict that written document unless you also find that terms were included in the document as a result of fraud or mutual mistake.

However, if you find that such written document was not intended to be a complete expression of all of the terms agreed upon by those parties, that is, that the document does not contain all of the terms of their agreement, then you may also consider evidence of the circumstances surrounding the making of the agreement to supply additional terms of the agreement between the parties, but only if they are not inconsistent with the provisions of the written document.

An appellate court reviews de novo alleged errors in a trial court's instructions to the jury. Moratti ex rel. Tarutis v. Farmers Ins. Co. of Wash., 162 Wn. App. 495, 505, 254 P.3d 939 (2011), review denied, 173 Wn.2d 1022, cert. denied, 133 S. Ct. 198 (2012). "Instructions are inadequate if they prevent a party from arguing its theory of the case, mislead the jury, or misstate the applicable law." Barrett v. Lucky Seven Saloon, Inc., 152 Wn.2d 259, 266, 96 P.3d 386 (2004). A court's omission of a proposed statement of the governing law will be reversible error where it prejudices a party. Barrett, 152 Wn.2d at 267.

WPI 301.06 is for use "when there is a written contract and a factual issue exists as to whether the contract is integrated." WPI 301.06 note on use at 207. The trial court declined to give Safeco's proposed instruction because it required the jury to first decide whether the settlement agreement was or was not integrated.[16] Integration was

---

[16] Report of Proceedings (Dec. 2, 2011) at 61.

not an issue; neither party contended that the settlement agreement was not integrated. The court rightly determined the instruction would be confusing.

Safeco contends that the instruction, even if imperfect, would at least have told jurors that extrinsic evidence cannot be used to contradict the terms of a written agreement. But as discussed above, extrinsic evidence was not admitted to contradict the terms of the settlement agreement. Safeco has not shown that it was prejudiced by the court's failure to give the proposed instruction. Instruction 5 adequately permitted Safeco to argue its theory that Miller's assignment to Kenny did not include Kenny's own damages and therefore only Kenny had the right to pursue them.

## DAMAGES EXCEEDING THE COVENANT JUDGMENT

Miller moved for partial summary judgment to establish that the order stipulating $4.15 million as the reasonable net amount of the covenant "judgment" was not a ceiling on damages but merely a floor—"the minimal amount of harm if Safeco is liable."[17] The trial court granted the motion, and the ruling was carried out during phase two of the trial in the instruction on the measure of damages. The jury was instructed that if it found Safeco acted in bad faith as to Kenny, it *must* include the $4.15 million set by the stipulated order and *should* consider other damages:

> If your verdict is for the plaintiff on Patrick Kenny's claim that Safeco failed to act in good faith, then you must determine the amount of money that will reasonably and fairly compensate the plaintiff for such damages as you find were proximately caused by Safeco's failure to act in good faith.

---

[17] Clerk's Papers at 3468.

If you find for the plaintiff on Patrick Kenny's claim for failure to act in good faith your verdict must include the following undisputed items:

The net amount of the Stipulated Order Re: Reasonableness of Settlements for $4,150,000.

In addition, you should consider the following past and future elements of damages:

1. Lost or diminished assets or property, including value of money;
2. Lost control of the case or settlement;
3. Reasonable value of expert or other costs or reasonable attorney fees incurred for the private counsel retained by Patrick Kenny;
4. Damage to credit or credit worthiness;
5. Effects on driving or business insurance or insurability;
6. Emotional distress or anxiety.

The burden of proving Patrick Kenny did not suffer damages rests upon Safeco. It is for you to determine, based upon the evidence, whether any particular element has been proved by a preponderance of the evidence.

Instruction 30. The elements of damage enumerated in items 1 through 6 ultimately accounted for $7.75 million of the damage award, on top of the obligatory $4.15 million.

Safeco contends the jury should not have been permitted to award damages exceeding the net amount set by the stipulated order.

"An action for bad faith handling of an insurance claim sounds in tort." Safeco Ins. Co. of Am. v. Butler, 118 Wn.2d 383, 389, 823 P.2d 499 (1992). Harm "is an essential element of an action for bad faith." Butler, 118 Wn.2d at 389. In previous cases, insurers have argued that when an insured obtains from the injured party a covenant not to execute on a stipulated judgment, the insured has suffered no harm and consequently has no bad faith claim to assign. See, e.g., Butler, 118 Wn.2d at 396; Besel v. Viking Ins. Co. of Wisc., 146 Wn.2d 730,

19

736, 49 P.3d 887 (2002). The Supreme Court has steadfastly rejected this argument. Butler, 118 Wn.2d at 396-400. In the context of a third party's claim against an insured, once the insured meets the burden of establishing bad faith, a rebuttable presumption of harm arises. Butler, 118 Wn.2d at 390. Safeco expressly states that the issue of presumed harm "is not before the Court here. Rather, this case involves what damages are encompassed by a covenant judgment settlement."[18]

If an insurer acts in bad faith, an insured can recover from the insurer the amount of a judgment rendered against the insured, even if the judgment exceeds contractual policy limits. Besel, 146 Wn.2d at 735; Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc., 161 Wn.2d 903, 920, 169 P.3d 1 (2007). As Besel recognizes, the "judgment rule" is the majority rule in the United States. Besel, 146 Wn.2d at 735.

What occurred in this case is what occurred in Butler and Besel—a covenant not to execute coupled with an assignment and settlement agreement. This arrangement did not release Kenny from liability; it was simply "an agreement to seek recovery only from a specific asset—the proceeds of the insurance policy and the rights owed by the insurer to the insured." Butler, 118 Wn.2d at 399, quoted in Besel, 146 Wn.2d at 737.

Safeco argues that Besel limits recovery to the amount of a reasonable covenant judgment—which in this case was the $4.15 million established by the

_____

[18] Brief of Appellant at 64.

order to which Safeco stipulated in May 2005. In Besel, the policy limits were $25,000. Like in this case, a passenger (Besel) who had been injured in a car accident settled with the insured driver by means of a stipulated covenant judgment (for $175,000) and then, as assignee of the driver's claims against the insurer, sued the insurer (Viking) for failure to settle. The trial court limited Besel's potential recovery for the driver's bad faith damages to the contractual policy limit of $25,000, which by that time Viking had already paid. Besel appealed. The Court of Appeals acknowledged that under Butler, harm was presumed and the insured's bad faith damages could exceed the policy limits. Besel v. Viking Ins. Co. of Wisc., 105 Wn. App. 463, 480, 21 P.3d 293 (2001), reversed, 146 Wn.2d 730, 49 P.3d 887 (2002). The Court of Appeals, however, disagreed with Besel's argument that satisfaction of his stipulated judgment for $175,000 was the appropriate remedy and instead remanded the case for the extent of his damages to be determined at trial. Besel, 146 Wn.2d at 482. The Supreme Court granted Besel's petition for review and reversed and remanded for entry of judgment reflecting the stipulated judgment amount of $175,000. The court held that the amount of a covenant judgment, when found to be reasonable, is the "presumptive measure of the insured's harm":

> We hold the amount of a covenant judgment is the presumptive measure of an insured's harm caused by an insurer's tortious bad faith if the covenant judgment is reasonable under the Chaussee criteria. [Chaussee v. Maryland Cas. Co., 60 Wn. App. 504, 803 P.2d 1339, 812 P.2d 487, review denied, 117 Wn.2d 1018 (1991).] This approach promotes reasonable settlements and discourages fraud and collusion. Furthermore, using the amount of a covenant judgment to measure tort damages in this context makes sense in light of our long-standing requirement that such

settlements be reasonable. If a reasonable and good faith settlement amount of a covenant judgment does not measure an insured's harm, our requirements that such settlements be reasonable is meaningless. Finally, the <u>Chaussee</u> criteria protect insurers from excessive judgments especially where, as here, the insurer has notice of the reasonableness hearing and has an opportunity to argue against the settlement's reasonableness.

<u>Besel</u>, 146 Wn.2d at 738-39.

According to Safeco, where <u>Besel</u> says the amount of a covenant judgment is "the presumptive measure of an insured's harm," it means that the insured's damages for the tort of bad faith are limited to the amount of damages the insured caused to the third party, as measured by the covenant judgment. As we read <u>Besel</u>, however, the reference to the "presumptive" measure of harm is not a limitation. It does not appear that Besel claimed Viking's bad faith conduct caused the driver any damages other than liability for the judgment, so there was no reason for the court to announce a rule barring Besel, as the driver's assignee, from recovering additional damages personal to the driver. When <u>Besel</u> is read in context with the Court of Appeals decision that it reversed, the proper interpretation of the above-quoted paragraph is that harm to the insured is presumptively worth *at least* the amount of the covenant judgment— not less. The Supreme Court implicitly confirmed this interpretation by explaining in a recent case that "in the insurance setting, the presumptive amount is added to *any other* damages found by the jury." <u>Bird v. Best Plumbing Group, LLC</u>, 175 Wn.2d 756, 770, 287 P.3d 551 (2012) (emphasis added). The holding of <u>Bird</u> is that a reasonableness hearing is an equitable procedure. The court stated, "Here, there is no factual determination to be made on damages in the later bad

faith claim, *at least not with respect to the covenant judgment.*" Bird, 175 Wn.2d at 772 (emphasis added). This sentence indicates the way is open for a jury to make a factual determination of an insured's bad faith damages *other than* and *in addition* to the covenant judgment.

Safeco proposes that "an insured should be put to an election. It must either prove all of its damages or it may choose to confine any bad faith recovery to the covenant judgment settlement amount. As a matter of law, it should not be able to recover both."[19] As authority, Safeco cites only former Justice James Dolliver's dissent in Butler. Justice Dolliver's concerns did not persuade the majority in Butler, nor did they prevail when considered again in Mutual of Enumclaw Insurance Company, 161 Wn.2d at 921.

Where the insured has caused damages clearly exceeding policy limits, an insurer's failure to offer policy limits exposes the insured to the risk of an excess judgment. Once it is determined that the insurer acted in bad faith by failing to settle, typically the chief component of the insured's damage caused by that failure will be the insured's liability to the third party. This component is measured by the amount of the third party's covenant judgment against the insured. However, the insured's damages may include as an additional component the damages caused *to him* by the insurer's bad faith. Examples include the potential effect on the insured's credit rating, damage to reputation, loss of business opportunities, and loss of control of the case. Butler, 118 Wn.2d at 399, 392. Other examples are loss of interest, attorney fees and costs,

---

[19] Brief of Appellant at 61.

financial penalties for delayed payments, and emotional distress, anxiety, and fear. Anderson v. State Farm Mut. Ins. Co., 101 Wn. App. 323, 333, 2 P.3d 1029 (2000), review denied, 142 Wn.2d 1017 (2001). Because bad faith is a tort, an insured is not limited to economic damages. Anderson, 101 Wn. App. at 333, citing Coventry Assocs. v. Am. States Ins. Co., 136 Wn.2d 269, 284-85, 961 P.2d 933 (1998).

Miller, the assignee of Kenny's claims against Safeco, acquired all of Kenny's rights as they existed at the time of assignment. Butler, 118 Wn.2d at 399. Because Kenny had the right to sue Safeco for damages other than and in addition to the amount of the covenant judgment, Miller acquired that right.

Safeco has not presented a coherent rationale based on policy or precedent for limiting damages to the amount of the covenant judgment. A covenant judgment, when found reasonable in a proceeding in equity, is the presumed measure of damage only for the insured's liability to third parties. The damages personal to the insured are determined by a finder of fact. The trial court properly allowed the jury to consider various elements of damage sustained by Kenny in addition to his liability to the passengers for the stipulated amount of $4.15 million.

We conclude the trial court did not err in allowing the jury to find damages in excess of the stipulated settlement.

UIM LIMITS

Early in the bad faith litigation, a dispute arose over the limits of Peterson's underinsured motorist coverage. The court ruled that the UIM limits were $500,000, not $100,000 as Safeco had represented. Whether Safeco acted in bad faith in making that representation was left to the jury to decide. Miller argued to the jury that Safeco misrepresented the UIM limits in bad faith and, as a result, kept back proceeds that could have been used to settle Peterson's claim and help protect Kenny.[20]

Safeco assigns error to the ruling that the limits were $500,000.

Washington law requires insurers to offer UIM coverage "in the same amount as the insured's third party liability coverage unless the insured rejects all or part of the coverage." RCW 48.22.030(3). "The Legislature, by the wording of the UIM rejection clause, intended that a named insured decline UIM coverage by an affirmative and conscious act and that such a rejection be in writing." Clements v. Travelers Indem. Co., 121 Wn.2d 243, 254, 850 P.2d 1298 (1993); RCW 48.22.030(4). Once the insured has signed such a rejection, it remains valid upon subsequent *renewals* of the policy. RCW 48.22.030(4). But if the insurer issues a *new* policy, it must again offer UIM coverage limits equal to the liability limits. Johnson v. Farmers Ins. Co. of Wash., 117 Wn.2d 558, 570, 817 P.2d 841 (1991).

---

[20] See, e.g., Report of Proceedings (Dec. 5, 2011) at 37-38 (Miller's opening statement); Report of Proceedings (Dec. 15-16, 2011) at 103, 123-25, 128-29 (closing argument).

From 1997 to 1999, the Petersons had an American States Insurance policy with liability limits of $500,000 per person and per accident. In January 1997, Cassandra Peterson's mother signed a written partial waiver, selecting UIM limits of $100,000 per person and $300,000 per accident. In April 1997, she again signed the waiver selecting the lower limits.

In November 1999, the Petersons added Cassandra's Volkswagen Passat to their American States policy. The UIM limits for the Passat alone were set at $500,000, equal to the liability limits. The declarations page notes that "this endorsement reflects the addition of the 1994 Volkswagen Passat eff. 11/3/99." Safeco charged $42.00 for the UIM coverage on the Passat and $24.80 apiece for two other vehicles. The Petersons paid the premium.

Safeco acquired American States in 1997. In early 2000, Safeco issued the Petersons the policy that was in effect in August 2000 when the Passat, driven by Kenny, rear-ended the cement truck. The policy listed the UIM limits for all three vehicles as $100,000/$300,000 effective April 20, 2000. A page entitled "Changes To Your Policy" advised the Petersons that the UIM limits reflected their previous choice to have UIM coverage in an amount less than liability coverage.

> The amount of coverage you previously selected for protection against uninsured and/or underinsured motorists was less than the bodily injury liability coverage you selected, or you rejected the coverage altogether. The choice you made has been reflected on this replacement policy. Other limits and prices are available.

Safeco did not include a written waiver for the Petersons to sign. The Petersons requested no changes. They paid the lower premium for the Passat's reduced

UIM coverage—$37.70, as compared to the previous premium of $42.00 for UIM limits of $500,000.

The issue on appeal is whether the Safeco policy issued in early 2000 with UIM limits of only $100,000 was a new policy requiring a written waiver or a renewal policy not requiring a written waiver. Johnson adopted a materiality standard to distinguish a new policy from a renewal policy. Torgerson v. State Farm Mut. Auto. Ins. Co., 91 Wn. App. 952, 958, 957 P.2d 1283 (1998). Adding an automobile to a policy is not by itself a material change creating a new policy. Johnson, 117 Wn.2d at 574. But changes in UIM coverage levels are material. Torgerson, 91 Wn. App. at 960-61.

For the 1997 American States policy, Cassandra Peterson's mother agreed in writing to UIM limits of $100,000. Safeco contends the 2000 policy was a renewal of the 1997 policy because it maintained UIM coverage at the same level. According to Safeco, the declarations page setting the Passat's UIM limits at $500,000 when the Passat was added to the policy in 1999 was a scrivener's error that should be disregarded.

Safeco cites American Commerce Insurance Company v. Ensley, 153 Wn. App. 31, 220 P.3d 215 (2009), review denied, 169 Wn.2d 1010 (2010). In order to keep her premiums low, Donna Ensley signed a waiver to lower her UIM coverage from $500,000 to $50,000. Later, she cancelled the collision coverage on one of her vehicles. The insurer mistakenly cancelled *all* coverage on that vehicle. Ensley pointed out the mistake, and the insurer corrected it by reinstating coverage on that vehicle other than collision. The insurer also

27

granted Ensley's request for a higher deductible. When Ensley's son was seriously injured while riding as a passenger in another of Ensley's vehicles, Ensley claimed that the changes made to the policy after her first waiver were material and the reduction of UIM coverage to $50,000 was ineffective because the insurer did not obtain a second written waiver. This court held that these changes did not result in a new policy because the UIM coverage level did not change after the first written waiver. Ensley, 153 Wn. App. at 41-42.

Safeco suggests that the policy issued to the Petersons in 2000 was simply the correction of an earlier mistake, and like the correction of the mistake in Ensley, it did not create a new policy. This argument fails. The insurer's mistake in Ensley was not material and did not create a new policy, most importantly because it did not affect the level of Ensley's UIM coverage. Ensley, 153 Wn. App. at 42. Therefore, Ensley's written waiver remained effective.

Here, the Petersons paid an extra premium for UIM coverage of $500,000 on their daughter's Passat in 1999. Whether this happened because they requested it or because of a scrivener's error is immaterial; the essential fact is that the Petersons paid to have limits of $500,000. The Safeco policy issued in 2000 reduced the UIM coverage on the Passat from $500,000 to $100,000. Under Johnson and Torgerson, that reduction was a material change that created a new policy.

The insurer has the burden of obtaining a knowing written rejection in order to avoid the statutory requirement for UIM coverage. Clements, 121 Wn.2d at 255. Safeco did not obtain a knowing written rejection when it issued the

policy in 2000 with limits reduced back down from $500,000 to $100,000. The trial court correctly determined that because Safeco did not obtain a written waiver, the UIM limits were equal to the liability limits of $500,000.

The trial court did not decide that Safeco's investigation and disclosure of the UIM limits was bad faith as a matter of law. The court ruled that material issues of fact remained as to whether Safeco reasonably believed the reduced UIM limits in the 2000 policy simply corrected a scrivener's error. The phase two verdict specifically determined that Safeco failed to act in good faith with respect to Peterson's UIM claim and thereby caused damage to her of $350,000. We find no error in the court's decision to permit this issue to go to the jury.

## ATTEMPT TO DEPOSE MILLER'S ATTORNEY

The introduction to Safeco's brief on appeal accuses Miller's attorney, Ralph Brindley, of frustrating Safeco's reasonable efforts at settlement in a deliberate attempt to set up a bad faith claim:

> This case demonstrates how an insurer can be "set up" for a bad faith claim. Too often, attorneys for claimants are not interested in actually settling their clients' claims when they believe that the applicable liability insurance limits are low compared to the severity of the injuries at issue. Instead, they readily frustrate settlement efforts, looking to trap the insurer in the handling of the claim by manipulating events to set up the insurer for a bad faith action by the insured, an action their clients receive by assignment in the course of negotiating an inflated covenant judgment settlement. That is precisely what happened here.
> The insurer, in this case, Safeco Insurance Company of Illinois ("Safeco"), was blamed for the lack of a settlement in the underlying case between driver/insured Patrick Kenny and his passengers, Ryan Miller, Ashley Bethards, and Cassandra Peterson. Safeco made a concerted effort to eliminate Kenny's exposure. But Safeco was faced with paying all liability insurance to one of three injured claimants thereby leaving its insured with no

coverage for the remaining two claims, or declining to pay the full limit to one of the three. It opted for the latter and was sued in bad faith for the failure to settle.

Settlement was frustrated at every turn by Ralph Brindley, Miller's lawyer. The trial court, however, refused to allow any discovery regarding Brindley's role in frustrating Safeco's settlement efforts on Miller's behalf and setting up Safeco for a bad faith action.[21]

Safeco claims that Brindley made unreasonable settlement demands, rebuffed Safeco's attempts to facilitate mediation, and manipulated the other claimants and their attorneys into signing the settlement agreement, all in order to put Miller in the driver's seat for what turned out to be a lucrative bad faith claim. The issue on appeal is whether the trial court unfairly prevented Safeco from questioning Brindley about his strategy.

In February 2007, Safeco sent Brindley a notice of deposition and a subpoena duces tecum for his correspondence, memorializations of conversations, and other documents in the underlying Miller v. Kenny litigation. As the defendant in the bad faith action, Safeco wanted to question Brindley about the rationale behind his negotiation tactics, his understanding of the provision of the settlement in which Kenny reserved his claims for personal damages, and his motive for bringing Miller's suit against Kenny. On April 23, 2007, Miller moved to quash on the basis of attorney-client privilege and asked the court to enter a protective order precluding further deposition and discovery requests.

The trial court considered Safeco's request to depose Brindley under the

---

[21] Brief of Appellant Safeco at 1-2.

three-part test outlined in <u>Shelton v. American Motors Corporation</u>, 805 F.2d 1323, 1327 (8th Cir. 1986):

> We recognize that circumstances may arise in which the court should order the taking of opposing counsel's deposition. But those circumstances should be limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel, <u>see</u>, <u>e.g.</u>, <u>Fireman's Fund Insurance Co. v. Superior Court</u>, 140 Cal.Rptr. 677, 679, 72 Cal.App.3d 786 (1977); (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.

Focusing on prong two, the trial court responded initially that even if Brindley's strategy in the <u>Miller v. Kenny</u> action was relevant to the bad faith action against Safeco, Safeco had not shown the information it was seeking was unprivileged. Safeco then argued that if Brindley could not be deposed, the court should not permit Miller to call him as a witness at trial.

The trial court granted Miller's motion to quash in March 2008. Later, the court ruled that Miller would not be able to call Brindley as a witness at trial without giving at least 60 days' notice, and if that occurred, Safeco would be permitted to renew its request for a deposition.

As the trial was about to begin in November 2011, Miller added Brindley to his witness list. Safeco objected, and the court granted Safeco's motion to exclude Brindley. Brindley did not testify.

Safeco contends the order granting Miller's motion to quash was prejudicial error warranting a new trial. A discovery order is reviewed for abuse of discretion. <u>T.S. v. Boy Scouts of Am.</u>, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006).

31

Under authorities cited by Safeco, information possessed by plaintiff's counsel in the underlying case may well be relevant in a bad faith case, and a deposition may be the most efficient way to obtain the information. If so, a blanket assertion of attorney-client privilege is not a sufficient basis to resist a notice of deposition. See, e.g., Meritplan Ins. Co. v. Superior Court, 124 Cal. App. 3d 237, 177 Cal. Rptr. 236, 237 (1981). However, Meritplan and similar cases have not established a per se rule that a deposition of plaintiff's counsel in the underlying case must always be allowed in a bad faith case.

The trial court in this case did not accept a blanket assertion of attorney-client privilege. Relying on Shelton, the court required Safeco to demonstrate that the specific information sought by Safeco was nonprivileged. Although Shelton has not been formally adopted in Washington, it is a leading case, and it is not inconsistent with Meritplan. The trial court did not abuse its discretion by looking to Shelton for guidance.

Applying the Shelton test, the trial court concluded that Safeco had failed to establish that the information it would be seeking from Brindley was nonprivileged. The record supports this conclusion. What Meritplan refers to as relevant information that may be most efficiently obtained through deposition is "the circumstances and content of the various negotiations and communications between the involved individuals." Meritplan, 124 Cal. App. 3d at 241. This is not the type of information Safeco wanted from Brindley. Safeco wanted to ask Brindley about matters that are covered by the attorney-client privilege and the work product privilege, including Brindley's strategy in refusing mediation and

why he demanded the entire policy limits for Miller. For example, counsel for Safeco told the trial court, "I want to know whether he was posturing in making a settlement demand or not."[22]

And Safeco does not persuasively show that being deprived of the opportunity to depose Brindley was prejudicial. Safeco did take the depositions of John Barlow and Monte Wolff, the attorneys who, respectively, represented Bethards and Peterson during the time period leading up to the settlement agreement. Safeco did not use their depositions at trial. Presumably, this was because their testimony, while mildly critical of Brindley's aggressiveness, was more pointedly critical of Safeco for waiting so long to tender policy limits. The same type of testimony coming from Brindley would not have been helpful to Safeco.

Safeco's rhetorical complaint that the bad faith litigation was a setup engineered by Brindley was not successful with the jury, and as a legal argument it is equally unsuccessful. Pressing for a policy limits settlement for a badly injured client is a professional responsibility, not a sinister plot. Keeping bad faith litigation in mind as plan B if the insurer balks is a fair practice. Safeco could have protected itself by putting the limits on the table for all three passengers.

Safeco refers to the covenant judgment of $4.15 million as "inflated." But Safeco itself stipulated to that amount as a reasonable measure of the damages incurred by Kenny's three passengers over and above the $1.8 million in policy

---

[22] Report of Proceedings (July 20, 2007) at 6.

proceeds already tendered. The legal requirement of a reasonableness hearing is there to protect insurers from inflated covenant judgments resulting from collusion and fraud. See, e.g., Water's Edge Homeowners Ass'n v. Water's Edge Assocs., 152 Wn. App. 572, 216 P.3d 1110 (2009), review denied, 168 Wn.2d 1019 (2010). There was no evidence of collusion or fraud around the settlement in this case. The claimants had serious injuries and were not at fault. Safeco, after resisting early demands for settlement on the basis that the three claims together did not approach the policy limits of $1.5 million, eventually stipulated that the total injuries exceeded policy limits by $4.15 million. It is hard to see how deposing Brindley could have helped Safeco put its delay in disclosing and offering policy limits into a more favorable light.

Under these circumstances, the trial court did not abuse its discretion by putting Brindley's deposition off limits unless Miller waived the privilege by calling Brindley as a witness at trial.

We conclude the order quashing the subpoena for Ralph Brindley did not constitute prejudicial error justifying a new trial.

## EVIDENCE OF LOSS RESERVES

Soon after the accident, Safeco was aware that Kenny, its insured, was most likely 100 percent at fault for his passengers' serious injuries. Safeco set its reserve for liability at $1.5 million, a figure that included the umbrella policy limits as well as the liability limits in the regular policy. The UIM reserve was $100,000. As part of its ongoing responsibility to stay informed about Kenny's exposure, Safeco reviewed its reserves approximately 20 times over the next 30 months.

34

Each time, Safeco concluded that Kenny was exposed to liability substantially in excess of policy limits.

Safeco moved in limine to exclude this evidence as irrelevant or more prejudicial than probative. The trial court denied the motion. Safeco assigns error to this evidentiary ruling. We review for abuse of discretion. Goehle v. Fred Hutchinson Cancer Research Ctr., 100 Wn. App. 609, 617, 1 P.3d 579, review denied, 142 Wn.2d 1010 (2000).

Reserves are estimates of the amount insurers will need in the future for unpaid claims and adjustment expenses. Reserves are used in determining an insurer's financial condition. RCW 48.12.030(2), .090. Because a reserve is an estimate that includes attorney fees and other adjustment expenses, it cannot be equated with settlement authority. Accordingly, in a personal injury suit, evidence of reserves may not be admitted as an acknowledgement of liability, and reserves are generally viewed as irrelevant to show how much an injury is worth. Silva v. Basin W., Inc., 47 P.3d 1184, 1191 (Colo. 2002).

However, reserves may be relevant and admissible in a case where the issue is whether the insurance company fulfilled its duty to adjust the insured's claim in good faith. See Silva, 47 P.3d at 1191-92. Here, for many months, Safeco refused to make the full amount of policy limits available to settle a case in which, as shown by the reserves, it had known almost from day one that its insured was exposed to much greater liability. The evidence was relevant and not unduly prejudicial. Safeco was free to explain through an expert witness or employee "the reason the reserve was established, the reasonableness of the

amount of the reserve, the allocation between indemnity and loss adjustment expenses and any other evidence relevant to the issue from the insurer's standpoint." Lipton v. Superior Court, 48 Cal. App. 4th 1599, 1615 n.17, 56 Cal. Rptr. 2d 341 (1996).

As a general policy, it is preferable that loss reserves not be admitted into evidence, because when an insurer sets loss reserves it should be solely concerned with the purpose of ensuring the company's financial stability and should not be tempted to "manipulate its reserves" to be consistent with the insurer's settlement position. STEPHEN S. ASHLEY, BAD FAITH ACTIONS: LIABILITY AND DAMAGES § 10:31 (1997). In this case, however, the discrepancy between Safeco's loss reserves and its settlement posture was enduring and sizable. We conclude the relevance was high enough to overcome the policy concern. The decision to admit the evidence was within the trial court's discretion.

DEPOSITION OF MARYLE TRACY

Safeco contends the trial court committed reversible error by allowing the jury to view the videotaped deposition of Maryle Tracy, a Safeco claims analyst. Tracy was briefly involved in the case during the time Kenny was considering assigning his rights and stipulating to judgment. In the deposition, Tracy was questioned by Miller about incentive programs for Safeco's employees that linked bonuses to cost control. Tracy's answers were evasive, and the trial judge later remarked that Tracy "was not a good witness for Safeco."[23]

Miller confronted Tracy with interrogatory answers she had provided on

---

[23] Report of Proceedings (Apr. 16, 2012) at 42.

behalf of Safeco in 2004 in a case in South Dakota. Tracy had initially denied that Safeco had programs rewarding its employees for keeping costs down, but she later amended her answers to admit that such programs did exist.[24]

Safeco contends the deposition should have been excluded because it was irrelevant, unduly prejudicial, and involved impeachment on a collateral matter.

Safeco's bonus and incentive programs were admissible to show that Safeco, at relevant times, was rewarding its adjusters financially for clamping down on coverage and defense costs. The existence of these programs and the action by a claims analyst to conceal them supplied evidence of Safeco's motive to avoid settling for policy limits. The deposition thus was relevant to the bad faith claim and not unduly prejudicial.

Safeco did not object below on the basis that evidence of Tracy amending her answers in the South Dakota case was impeachment on a collateral matter. That objection is not preserved, and we decline to address it.

We find no abuse of discretion in the decision to admit Tracy's deposition.

## ATTORNEY MISCONDUCT

Leading questions

David Beninger, Brindley's partner, represented Miller at trial. Beninger repeatedly asked leading questions of his own witnesses, drawing numerous objections. Safeco contends the questions were often testimonial in nature and

---

[24] Report of Proceedings (Dec. 8, 2012) at 153-82.

that the cumulative effect tainted the trial irreparably.

A new trial may be granted based on prejudicial misconduct of counsel if the moving party establishes that the conduct complained of constitutes misconduct, as distinct from mere aggressive advocacy, and that the misconduct is prejudicial in the context of the entire record. Aluminum Co. of Am. v. Aetna Cas. & Surety Co., 140 Wn.2d 517, 539, 998 P.2d 856 (2000).

One type of misconduct that may justify a new trial is unfairly and improperly exposing the jury to inadmissible evidence. Teter v. Deck, 174 Wn.2d 207, 223-25, 274 P.3d 336 (2012). "While the asking of leading questions is not prejudicial error in most instances, the persistent pursuit of such a course of action is a factor to be added in the balance." State v. Torres, 16 Wn. App. 254, 258, 554 P.2d 1069 (1976).

In denying Safeco's motion for a new trial, the trial court commented, "there's no doubt Mr. Beninger is the king of leading questions."[25] The court observed, however, that there had been an unusually large number of objections from both sides, that almost all of Safeco's objections to leading questions were sustained, and that Safeco had made no request for a curative instruction. "So I did not believe the number and nature of those questions were so obnoxious and tainted the jury to a degree that a new trial would be warranted."[26]

The trial court is in the best position to most effectively determine if counsel's misconduct prejudiced a party's right to a fair trial. Teter, 174 Wn.2d at

---

[25] Report of Proceedings (Apr. 16, 2012) at 44.
[26] Report of Proceedings (Apr. 16, 2012) at 44.

223. The particular instances of improper questioning cited by Safeco are not so prejudicial in the context of the record as a whole as to compel us to disagree with the trial court's assessment.

Closing Argument

Safeco contends Beninger's closing argument resulted in a verdict that was the product of passion and prejudice, and that the trial court should have granted a new trial on this basis.

Safeco moved in limine to preclude counsel from making a "golden rule" argument or a "send-a-message" argument. A golden rule argument urges jurors to imagine themselves in the position of a party and to grant that party the relief they would wish to have for themselves. A golden rule argument is improper. Adkins v. Aluminum Co. of Am., 110 Wn.2d 128, 139, 750 P.2d 1257, 756 P.2d 142 (1988). At the hearing on Safeco's motion, Beninger agreed to refrain from making a golden rule argument, but he argued that in a bad faith case, "the whole purpose being deterrence," it would be inappropriate to ban a "send-a-message" argument.[27] The trial court granted Safeco's motion in limine only as it pertained to golden rule arguments.

Beninger began closing argument by explaining that a trial takes place in the locale where key events happened because the local jury reflects the "conscience of the community" and serves as a protector and guardian for the community.[28] This speech was not a golden rule argument. Appeals for a jury to

---

[27] Report of Proceedings (Nov. 22, 2011) at 86.
[28] Report of Proceedings (Dec. 15, 2011) at 63.

act as a conscience of the community are not impermissible, unless specifically designed to inflame the jury. State v. Finch, 137 Wn.2d 792, 842, 975 P.2d 967, cert. denied, 528 U.S. 922 (1999). Miller's argument was not inflammatory, and it was not an appeal to parochial pride or prejudice. Cf. Pederson v. Dumouchel, 72 Wn.2d 73, 83, 431 P.2d 973 (1967) (defense counsel, who lost no opportunity to point out that plaintiff and his lawyers and witnesses did not live in Aberdeen, "attempted to turn the jury into a hometown rooting section.")

Beninger asked the jury to consider whether Safeco's conduct reflected "how we, as a community, want to be treated":

> did they do things the right way to reflect how we, as a community, want to be treated? And if so, side with Safeco. Side with Safeco. And then hope you don't have an accident with someone from Safeco. Or the other insurance companies, who will all be seeing this, as we've heard, from the experts, they will all be publicizing this, and they will all be a race to the bottom then. But that's your decision. That's your values. That's what you get to decide, how we all are going to be treated equally, what that means.[29]

Although Safeco did not object to this speech or any other portion of plaintiff's closing argument, Safeco contends that the motion in limine preserved error.

The court's ruling on the motion in limine precluded golden rule arguments but not send-a-message arguments. The argument about "how we, as a community, want to be treated" is close to the line separating the two. Under these circumstances, the ruling in limine did not excuse Safeco from making a more contemporaneous objection. The vice of a golden rule argument is that it

---

[29] Report of Proceedings (Dec. 15, 2011) at 72.

encourages the jury to "'depart from neutrality and to decide the case on the basis of *personal* interest and bias rather than on the evidence.'" Adkins, 110 Wn.2d at 139 (emphasis added), quoting Rojas v. Richardson, 703 F.2d 186, 191 (5th Cir. 1983). Beninger did not appeal to juror self-interest; rather, he appealed to the jurors' interest as members of the public to "protect the public interest" and to enforce the public "compact" that insurance companies have under the law to comply with their duties of reasonable care, good faith, and fair dealing.[30] This is not improper argument in a bad faith case.

The effect of a golden rule argument on a jury is "difficult to ascertain," and in most cases, any prejudicial effect can be removed, if there is a timely objection, by the trial court instructing the jury to disregard the argument. Adkins, 110 Wn.2d at 142. Safeco did not make a timely objection. And the challenged remarks when read in the overall context of the trial are more properly characterized as aggressive advocacy than as misconduct. We therefore conclude the argument of counsel did not furnish a basis for ordering a new trial.

INTEREST

Prejudgment Interest

On March 8, 2012, the trial court entered an order awarding Miller prejudgment interest of $7.115 million. This figure was determined by taking the settlement of $4.15 million reached by Kenny and the three claimants in May 2003 and compounding it annually at 12 percent. The rate of 12 percent was specified in the settlement agreement:

---

[30] Report of Proceedings (Dec. 15, 2011) at 83.

**Interest**: The parties acknowledge that a delay in the determination or entry of judgments may be of benefit to Mr. Kenny, but detrimental to the Plaintiffs. Therefore, the parties agree that 12% statutory rate of interest shall accrue and compound annually on the unpaid damages from the date of this agreement.

Safeco assigns error to the order awarding prejudgment interest, but Safeco's brief does not explain how it was erroneous. Below, Safeco argued that prejudgment interest was already encompassed by instruction 30, which allowed the jury to award, as damages, "Lost or diminished assets or property, *including value of money.*" Safeco also argued below that if the court did award prejudgment interest, it should not begin to run until the date of the reasonableness stipulation in 2005. Safeco does not present these arguments on appeal. The failure of an appellant to provide argument and citation of authority in support of an assignment of error precludes appellate consideration of an alleged error. RAP 10.3; Avellaneda v. State, 167 Wn. App. 474, 482 n.5, 273 P.3d 477 (2012). Therefore, the award of $7.115 million in prejudgment interest will not be disturbed.

Postjudgment Interest

On June 14, 2012, the trial court entered an order awarding postjudgment interest at the rate of 12 percent. The trial court accepted Miller's argument that the 12 percent rate of contract interest specified in the May 2003 agreement was the applicable rate not only for prejudgment interest but also for the final judgment. This was error because the final judgment against Safeco was founded on tortious conduct. See RCW 4.56.110(3)(b).

42

Miller relies on the principle that interest on a judgment will run at a specified interest rate for which the parties have contracted, even where the contract is a settlement agreement that settles a tort suit. "Once parties have agreed to settle a tort claim, the foundation for the judgment is their written contract, not the underlying allegations of tortious conduct." Jackson v. Fenix Underground, Inc., 142 Wn. App. 141, 146, 173 P.3d 977 (2007), applying RCW 4.56.110(1).

In Jackson, the judgment at issue was a covenant judgment entered in the underlying action between the claimants and the insured defendant after a reasonableness hearing in which the insurer participated. Our statement in Jackson quoted above "referred to the allegations of tort liability that were resolved by the settlement in the underlying suit." Unigard Ins. Co. v. Mut. of Enumclaw Ins. Co., 160 Wn. App. 912, 926, 250 P.3d 121 (2011). In Jackson, there was no secondary bad faith action against the insurer. Here, the judgment accumulating interest is not the claimants' settlement with Kenny in May 2003. It is the judgment on the verdict of $13 million in the secondary bad faith action against Safeco entered on March 8, 2012. Irrespective of the 2003 agreement by which the passengers in the Passat settled their personal injury claims against Kenny, Miller's judgment against Safeco exists only because Miller prevailed against Safeco on the assigned bad faith claims. There was no settlement agreement between Miller and Safeco. See Unigard, 160 Wn. App. at 926.

As a further basis for arguing that contract interest was properly awarded on the judgment against Safeco, Miller points out that the jury found that Safeco

breached its obligations under the insurance contract. The insurance contract has no bearing on the question as it does not specify a rate of interest.

The primary foundation for Miller's judgment against Safeco was Safeco's tortious bad faith conduct. See Unigard, 160 Wn. App. at 927-28; Woo v. Fireman's Fund Ins. Co., 150 Wn. App. 158, 165, 208 P.3d 557, review denied, 167 Wn.2d 1008 (2009). The trial court should have set postjudgment interest at the tort judgment rate of RCW 4.56.110(3)(b). The judgment must be remanded to make that correction.

## ATTORNEY FEES

On March 8, 2012, the court also entered a judgment awarding Miller attorney fees and costs. The basis for the award was the Consumer Protection Act, RCW 19.86.090.

The court accepted Miller's lodestar calculation of attorney fees of $1,071,470, based on a total of 3,229.8 hours. The hourly rate the court accepted as reasonable was $400 to $450 for attorney David Beninger, $325 for attorneys Deborah Martin and Patricia Anderson, $300 to $450 for appellate counsel Howard Goodfriend, and $75 to $125 for paralegal services by three individuals. The court granted a multiplier of 1.5 for a total attorney fee award of $1,563,803.75. This was the precise amount requested by Miller. Safeco contends the amount is unreasonable and the trial court failed to give Miller's fee request appropriate scrutiny.

This court reviews a trial court's award of attorney fees for an abuse of discretion. Mahler v. Szucs, 135 Wn.2d 398, 435, 957 P.2d 632, 966 P.2d 305

44

(1998). To reverse an attorney fee award, we must find the trial court exercised its discretion on untenable grounds or for untenable reasons. <u>Chuong Van Pham v. City of Seattle</u>, 159 Wn.2d 527, 538, 151 P.3d 976 (2007).

A determination of reasonable attorney fees begins with a calculation of the "lodestar," which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. <u>Mahler</u>, 135 Wn.2d at 433-34.

Safeco challenges the determination of the reasonable hourly rates. The fee customarily charged in the locality for similar legal services is one of the factors to be used in determining the proper rate. <u>Mahler</u>, 135 Wn.2d at 433 n.20. Safeco contends the trial court failed to give appropriate consideration to evidence that the hourly rates claimed by counsel for Miller were higher than those customarily charged by attorneys in Skagit County.

The trial court found that the difficulty of the case made it appropriate for Miller to be represented by counsel with a high level of specialization:

> It is not appropriate to restrict the hourly rate to the locality of Skagit Valley, as this Court enjoys and benefits from a rich exchange of lawyers from the entire Puget Sound region, and while certain events or cases may be handled largely within a market of this county, this kind of suit and litigation is not so geographically limited but instead requires a much broader degree of talent and specialization. This case required a high level of skill in the specialized area of insurance bad faith, assignments, contract and CPA, as well as a high level of skill in trial preparation and presentation. Few law firms in the Puget Sound region are equipped to take these kinds of cases on behalf of a client.[31]

Local rates are just one factor in determining the reasonableness of fees and not always a dispositive factor. <u>Crest Inc. v. Costco Wholesale Corp.</u>, 128

---

[31] Finding of Fact/Conclusion of Law 11, Clerk's Papers at 5712.

Wn. App. 760, 774, 115 P.3d 349 (2005). The trial court's rationale for approving

hourly rates higher than those customarily charged in Skagit County was

grounded in the difficulty and novelty of the issues and the specialized skills

required, factors mentioned in RPC 1.5(a). In addition, as noted by the trial

court, the fees and costs claimed by the opposing party challenging the request

are also appropriate to consider for comparative purposes. See Absher Const.

Co. v. Kent Sch. Dist. No. 415, 79 Wn. App. 841, 847, 917 P.2d 1086 (1995).

"The Court here was *not* informed of Safeco's attorney fee bill."[32]

We find no abuse of discretion in the determination of reasonable hourly

rates.

Safeco contends that the court's determination of the number of hours

reasonably expended cannot stand because it is not based on contemporaneous

billing records. Beninger arrived at 3,229.8 hours by going through the

correspondence file and the extensive trial docket after the trial was over and

estimating the time related to each item for each timekeeper.

To assist the court in determining the hours reasonably expended,

attorneys "must provide reasonable documentation of the work performed. This

documentation need not be exhaustive or in minute detail, but must inform the

court, in addition to the number of hours worked, of the type of work performed

and the category of attorney who performed the work (i.e., senior partner,

associate, etc.)." Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597,

675 P.2d 193 (1983). In Mahler, the court stated that counsel "must provide

---

[32] Clerk's Papers at 5721.

contemporaneous records documenting the hours worked." Mahler, 135 Wn.2d at 434. Safeco contends the lack of contemporaneous time or billing records means that Miller's fee request should have been denied altogether or at least reduced by a sizable percentage.

As stated by one of the cases Safeco cites, the "better practice is to prepare detailed summaries based on contemporaneous time records." Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1327 (D.C. Cir. 1982). But there is no per se rule, even in the federal courts, that permitting an attorney to rely upon reconstructed time records is an abuse of discretion. Carter v. Sedgwick County, Kan., 929 F.2d 1501, 1506 (10th Cir. 1991).

The same judge presided over almost every pretrial event as well as the trial and posttrial proceedings. Characterizing the presentation of attorney time as "conservative," the court found that the plaintiff "omitted billing time spent on certain routine, reasonable and necessary matters such as phone calls, interoffice communications, developing theories and strategies, and more, and has taken reasonable steps to avoid and reduce claims for fees that might involve duplicative, non-productive or wasteful matters."[33] Our review of the record confirms that the time claimed for particular events during the litigation was not inflated. We conclude the reconstruction of hours from the court docket and the correspondence file was an adequate basis for the determination.

The total hours an attorney has recorded for work in a case is to be discounted for hours spent on "unsuccessful claims, duplicated effort, or

---

[33] Clerk's Papers at 5682.

47

otherwise unproductive time." Bowers, 100 Wn.2d at 597. A trial court does not need to deduct hours here and there just to prove to the appellate court that it has taken an active role in assessing the reasonableness of a fee request. Berryman v. Metcalf, 177 Wn. App. 644, 312 P.3d 745 (2013), review denied, ___ Wn.2d ___ (2014). But the court's findings must show how the court resolved disputed issues of fact and the conclusions must explain the court's analysis. Berryman, 312 P.2d at ___.

Safeco contends the trial court should have segregated the time associated with the consumer protection claim, on which fees were recoverable, from the tort claims for bad faith and negligence, on which fees were not recoverable. Safeco did not make this argument in its trial brief opposing the request for an attorney fee award. The order awarding attorney fees found that Miller's several causes of action were interrelated. They all "involved a common core of facts and circumstances, in which the time devoted to discovery, pretrial motions and preparation and trial of this intertwined action cannot be reasonably segregated (which is one reason this Court previously denied Safeco's motion to bifurcate the causes of action)."[34] The trial record supports the court's characterization of the interrelatedness of the causes of action. Especially because Safeco made no proposal as to how the time could have been segregated, we cannot find that the trial court was obliged to make a segregation.

---

[34] Clerk's Papers at 5712.

48

As a discovery sanction ordered by the trial court on February 15, 2008, Safeco paid Miller's attorney fees of $43,487.37 incurred in connection with the uninsured motorist coverage issue.[35] Because Miller's request for attorney fees at the end of the case included 45 hours for work related to UIM coverage, Safeco contends the same work was billed twice. In response to this contention below, Beninger provided a supplemental declaration in which he explained that the payment received from Safeco in 2008 was only for fees incurred in establishing, by order of partial summary judgment, that the policy provided UIM coverage of $500,000. Whether Safeco committed bad faith when it represented that the policy limits were $100,000 was an issue left for trial. Safeco does not rebut Miller's explanation that these were two separate issues, and we therefore conclude the claim of double billing is unfounded.

Safeco contends the court erred by awarding fees for counsel's unsuccessful efforts. Safeco specifically refers to time spent on a motion concerning legal duties that did not result in a jury instruction, researching a cause of action that was never brought, advocating motions in limine that the court denied, and opposing Safeco's motions in limine that the court granted. Safeco contends the time spent on these efforts should have been excluded under Chuong Van Pham, 159 Wn.2d at 539-40. In Chuong Van Pham, the Supreme Court affirmed the trial court's decision to reduce the lodestar for time spent on unsuccessful claims. The case holds that appellate courts will ordinarily defer to the trial court's discretion, especially in complex cases. "The issue

---

[35] Clerk's Papers at 5461-62.

before us is not whether we would have awarded a different amount, but whether the trial court abused its discretion." Chuong Van Pham, 159 Wn.2d at 540. Here, unlike in Chuong Van Pham, the trial court made no finding that the efforts of counsel identified by Safeco were unnecessarily expended, unproductive, or insufficiently related to the overall success of the litigation.

The trial judge is in the best position to determine the proper lodestar amount. Fiore v. PPG Indus., Inc., 169 Wn. App. 325, 351, 279 P.3d 972; Morgan v. Kingen, 141 Wn. App. 143, 163, 169 P.3d 487 (2007), review denied, 175 Wn.2d 1027 (2012). The trial judge in this case was mindful of his duty under Bowers and Mahler to consider the fee request thoughtfully, and he was well versed in the legal standards applicable to fee requests. We find no abuse of discretion in the calculation of the lodestar amount.

Finally, Safeco challenges the multiplier of 1.5.

Adjustments to the lodestar product are reserved for "rare" occasions. Sanders v. State, 169 Wn.2d 827, 869, 240 P.3d 120 (2010). The lodestar fee is presumed to adequately compensate an attorney. Fiore, 169 Wn. App. at 355; Chuong Van Pham, 159 Wn.2d at 542. Typically, the quality of work performed will not justify an enhancement because "in virtually every case the quality of the work will be reflected in the reasonable hourly rate." Bowers, 100 Wn.2d at 599. Safeco contends that the risk assumed by Miller's attorneys was already accounted for by the hourly rates approved as part of the lodestar.

The trial court aptly summarized the risk assumed by Miller's attorneys:

This Court is intimately familiar with the details and duration of this marathon case. This case has been ongoing since 2002 and is one of the most complex and difficult civil cases ever undertaken in Skagit County. The case took nearly eight years of litigation, a 14 day bifurcated jury trial, two previous trips to the Court of Appeals, 70,000 pages of documents, 95 motions, a $25,000 discovery sanction imposed, and 669 entries in the trial court docket. This case was tough.[36]

Since <u>Bowers</u>, a recurring question "has been whether the business risk inherent in taking a contingent fee case justifies enhancing the lodestar." <u>Berryman</u>, 312 P.3d at 758. Here, it did. The trial court appropriately decided that this is one of the rare cases in which risk justified a multiplier. The risk was all or nothing. Eight years was an unusually long time to go without payment, especially considering the amount of work the litigation required throughout those eight years. Furthermore, private prosecution of Consumer Protection Act violations is backed by public policy. Protecting consumers against the bad faith of insurance companies fulfills the purpose of the statute that authorizes the fee award. The litigation vindicated the right of every consumer who pays for liability insurance—often a very significant portion of the household budget—to be protected from a financial catastrophe. When litigation under the Consumer Protection Act "produces protection for everyone who might in the future be injured by a specific violation, then it follows that the reasonableness of the attorney's fee should be governed by substantially more than the import of the case to the plaintiff alone." <u>Berryman</u>, 312 P.3d at 762, citing <u>Connelly v. Puget Sound Collections, Inc.</u>, 16 Wn. App. 62, 65, 553 P.2d 1354 (1976).

---

[36] Clerk's Papers at 5720.

The trial court took the quality of the representation into consideration but ultimately the decision to award a multiplier was based on the significance of the risk: "A lodestar multiplier of 1.5 is appropriate given the contingent representation and risks this matter presented at the inception and throughout the 8 years of non-payment, and the exceptional quality of representation provided to the plaintiff by his counsel. Although the verdict was substantial, at the time of accepting the case it was of a significant risk and given the quality of the representation an upward adjustment is appropriate."[37]

We find no abuse of discretion in the use of the multiplier to enhance the fee award.

## COSTS

The trial court granted every litigation expense Miller claimed, for a total award of $138,433.94 in costs. Safeco contends Miller was not entitled to recover expenses beyond statutory costs identified in RCW 4.84.010. We agree.

Relatively minimal statutory costs are provided for in RCW 4.84.010 (e.g., filing and service fees, witness fees, and expenses of obtaining records that are admitted into evidence). The trial court concluded that in a bad faith case, an award of costs is not limited by RCW 4.84.010 but rather may be expanded to include such items as out-of-pocket expenses for transportation, lodging, and services. The court found the costs it awarded were "reasonable and necessarily

---

[37] Clerk's Papers at 5713 (Findings of Fact and Conclusions of Law).

incurred for the successful resolution of the bad faith, contract and other intertwined causes of action."[38]

The Consumer Protection Act does not authorize an award of costs beyond those permitted by RCW 4.84.010. Nordstrom, Inc. v. Tampourlos, 107 Wn.2d 735, 743, 733 P.3d 208 (1987). In arguing a bad faith verdict justifies expanded costs, Miller relies on Panorama Village Condominium Owners Association Board of Directors v. Allstate Insurance Company, 144 Wn.2d 130, 144, 26 P.3d 910 (2001). But in that case, the court allowed broad recovery of costs only because the plaintiff had successfully contested a coverage issue, and the court found authority for expanded costs in Olympic Steamship Company v. Centennial Insurance Company, 117 Wn.2d 37, ___ 811 P.2d 673 (1991). Panorama Village, 144 Wn.2d at 133 (identifying issue as "When a plaintiff is entitled to an award of reasonable attorney fees pursuant to Olympic Steamship, are costs limited to those expenses enumerated in the cost recovery statute?" (footnote omitted)). The only part of Miller's case that involved Olympic Steamship was the dispute about whether Peterson's UIM coverage was $500,000 or $100,000. That issue was resolved early, and Miller has not shown that the expenses included in the challenged cost award were attributable to the resolution of that coverage dispute.

Miller also cites Griffin v. Allstate Insurance Company, 108 Wn. App. 133, 148, 29 P.3d 777, 36 P.3d 552 (2001), review denied, 146 Wn.2d 1005 (2002). In that case, the plaintiffs were sued for damaging their neighbors' property.

---

[38] Clerk's Papers at 5713 (Findings of Fact and Conclusions of Law).

53

When their insurer denied coverage, they had to pay their own defense costs and an expert on claims handling. In their bad faith case, they claimed these costs as *damages* resulting from breach of the duty to defend—not as attorney fees. Griffin, 108 Wn. App. at 147. Miller had his opportunity to obtain costs as damages pursuant to instruction 30, which identified the types of damages that can be awarded for bad faith. Griffin does not authorize deviating from the statutory definition for an award of costs included in an award of attorney fees.

Miller fails to show that any of the expenses included in the cost award of $138,433.94 are within the definition of costs awardable under RCW 4.84.010. Accordingly, we conclude it was error to make an award of costs.

### ATTORNEY FEES ON APPEAL

We grant Miller's request for attorney fees on appeal under RCW 19.86.090 and, where applicable, under Olympic Steamship.

### SAFECO'S MOTION TO STRIKE

Miller's reply brief argued that Safeco did not have "standing to challenge the terms of the validity of the assignment between Kenny and Miler." Safeco has moved to strike that argument. We deny the motion. The standing argument is not new, and in any event, we have not had to address it.

### CONCLUSION

The order denying a new trial is affirmed. The judgment on the verdict is affirmed. The order awarding prejudgment interest is affirmed. The order awarding postjudgment interest is reversed and remanded for redetermination using the statutory rate of interest for judgments founded on tortious conduct.

The judgment for attorney fees is affirmed. The award of costs is reversed and vacated. Miller is entitled to an award of reasonable attorney fees on appeal, subject to compliance with RAP 18.1.

Becker, J.

WE CONCUR:

Spearman, C.J.

Dwyer, J.

FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2014 APR 28 AM 9: 40