IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOGINDER SINGH dba AP TRANSPORT, | ) ) ) | No. 76479-9-I |
| Respondent, | ) ) ) | DIVISION ONE |
| v. | ) ) ) | |
| ZURICH AMERICAN INSURANCE COMPANY, a foreign insurer doing business in Washington State, | ) ) ) ) | UNPUBLISHED OPINION  FILED: August 13, 2018 |
| Appellant. | ) ) ) | |

BECKER, J. — The insurer of a truck driver who caused a multi-vehicle freeway accident settled the largest claim for policy limits and then refused to defend its insured from a smaller claim. The insurer appeals from a jury verdict on a claim of bad faith. We affirm the judgment on the verdict.[1]

## FACTS

The case arose from a 16-vehicle traffic accident on July 20, 2011. A chain reaction was precipitated when an employee of respondent Joginder Singh, driving Singh's semitruck, approached congested traffic ahead of him in the right lane without slowing down. He swerved into the adjacent lane and

---

[1] This case is linked to Zurich American Insurance Co. v. Sykes, No. 76009-2-I.

collided with a logging truck owned by Gilliardi Logging and Construction Inc. The momentum of the collision caused the trucks and their cargo to crash into other vehicles. One, a truck driven by Bryan Sykes, was flipped onto its side. Another was occupied by nine-year-old Nancy Beckwith, who died as a result of the impact.

Beckwith's family and estate filed a wrongful death complaint against Singh and Gilliardi and secured a trial date in 2013. The Beckwith claimants made clear early on that they saw the value of their claim as exceeding the combined policy limits of Singh and Gilliardi and they were not interested in global mediation with other claimants.

Singh was insured by appellant Zurich American Insurance Company with a limit of $1 million in coverage for liability. The insurance policy set forth Zurich's duty to defend Singh. It also stated, "We may investigate and settle any claim or 'suit' as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements."

Zurich retained attorney Ken Roessler to defend Singh. Roessler contacted other potential claimants asking for information about their claims. He received a letter of representation from Sykes' attorney stating that Sykes was injured. Although the letter did not specify the details of Sykes' damages, it said he "makes claim for said injuries" and stated that his wife and daughters were tendering loss of consortium claims. Farmers Insurance Company, having paid claims to its own insureds, filed a subrogation suit for $25,150.32.

2

Roessler recognized that it was in Singh's interest to remove his exposure to the Beckwith claim by offering to settle for $1 million. At the same time, he recognized that under the Zurich policy, a settlement that exhausted Singh's policy limits would leave Singh undefended if other significant claims emerged later. Roessler testified that he was trying to think of "creative ways" to get the Beckwith claim settled while still maintaining a defense for Singh to continue "shooing away" the other claims.[2] In January 2013, Roessler asked Zurich to allow Singh to contribute $1,000 toward the $1 million that would be offered to settle the Beckwith claim. He wrote, "Mr. Singh understandably wants to keep some indemnity money left on the Zurich policy so he can continue to get a legal defense, while he would still be effectively tendering his 'policy limit' to the Beckwith Estate plaintiffs and maximizing his chances for negotiating settlement with them and avoiding the significant excess exposure that the Beckwith Estate wrongful death claim represents."[3]

Zurich declined Roessler's proposal and instructed Roessler to offer to settle the Beckwith claim for the full $1 million policy limit in March 2013. Roessler did so, and the offer was accepted. Zurich wrote to Singh quoting the policy and explaining that the policy "does not require Zurich to allow you to pay a portion of the settlement so as to not exhaust your limits of liability."[4]

At the same time, the Beckwith plaintiffs accepted a policy limits settlement of $2 million from Gilliardi, who was covered by Alaska National

---

[2] Clerk's Papers at 631-32.
[3] Clerk's Papers at 1091-92.
[4] Clerk's Papers at 37-38.

3

Insurance. Under the terms of the settlement, Gilliardi held back $100,000 until the expiration of the statute of limitations. This arrangement allowed Gilliardi to maintain some degree of coverage and to have a defense in the event another claimant came forward.

Farmers withdrew its subrogation suit upon learning that Singh's policy limits had been exhausted. For a number of months, Zurich continued to pay Roessler to fend off the other claims.[5]

The statute of limitations expired in July 2014. Shortly before that, Sykes filed a complaint. Singh tendered the complaint to Zurich. On August 1, 2014, Zurich informed Singh that because his policy limits had been exhausted, the company had no further duty to defend and would not defend him. "Since Zurich can take no further action, it will be up to you to handle this matter personally."[6]

Singh retained private counsel and settled with Sykes for $250,000 on May 11, 2016. The trial court determined this was a reasonable settlement after holding hearings on September 16 and 23, 2016. Meanwhile, Singh proceeded with a lawsuit against Zurich for bad faith, breach of contract, negligence, and violations of the Insurance Fair Conduct Act (IFCA) and the Consumer Protection Act (CPA). The case went to trial in December 2016.

The jury found that

- Zurich breached the insurance policy, causing economic damages of $286,000. This included $250,000, the amount of his settlement with

---

[5] Clerk's Papers at 631-62.
[6] Clerk's Papers at 48-49.

4

Sykes that constituted presumed damages for Zurich's bad faith, and $36,000 in damages for the legal fees he incurred defending Sykes' suit;

- Zurich was negligent, causing the same $286,000 in economic damages;

- Zurich failed to act in good faith, causing the same $286,000 in economic damages plus $5,000 in emotional distress damages;

- Zurich violated the IFCA, but the violation did not cause damage; and

- Zurich did not violate the CPA.

The trial court entered judgment on the verdict of $291,000.00 plus interest and awarded Singh $293,710.23 in attorney fees and costs. Zurich appeals.

## ANALYSIS

### Evidence of Bad Faith

This was an excess exposure case involving multiple claimants. Given the damage caused by the accident, Singh's liabilities were certain to exceed his $1 million policy limit. Due to the large number of potential claimants, Singh's potential defense costs were high. These costs were Zurich's responsibility as long as Zurich was obligated to provide a defense for Singh. Singh alleged that Zurich, favoring its own interest over his, exhausted the policy limit in the Beckwith settlement so that it could refuse to defend him from other claimants and save on the costs of defense. This decision, according to Singh, unfairly left him exposed to substantial defense costs when Sykes sued him.

In four separate motions, Zurich asked the trial court to rule that its decision to exhaust the policy limits in the Beckwith settlement was in good faith as a matter of law. Zurich appeals the denial of all four motions. As Zurich summarizes its position, there was no need for a trial because after the limits were exhausted, Zurich had an unambiguous contractual right to terminate Singh's defense:

> ZAIC's exercise of its contractual right to terminate its defense upon policy exhaustion cannot be a basis for bad faith or for any other theory of liability. The duty of good faith and fair dealing safeguards both parties' rights to receive the benefits of the agreement *actually* made. The duty may not be used to create new rights or obligations not otherwise provided for in the parties' contract. An insurer's duty to consider an insured's interests equally with its own does not require the insurer to submerge its own interests, or surrender its contractual rights.
> . . . Material facts are not in dispute. ZAIC defended and settled Singh's largest exposure by far. There is no dispute the amount paid to settle *Beckwith* was justified, and no dispute Singh needed protection from the significant personal exposure *Beckwith* presented. Singh's policy unambiguously terminated ZAIC's duty to defend when his policy exhausted. When *Sykes* was filed sixteen months later, ZAIC simply had no duty to defend.[7]

Whether an insurer acted in bad faith is typically a question of fact. Smith v. Safeco Ins. Co., 150 Wn.2d 478, 485, 78 P.3d 1274 (2003). Zurich could prevail as a matter of law only if there were no disputed material facts pertaining to the reasonableness of its conduct under the circumstances. Smith, 150 Wn.2d at 484. Review is de novo. Smith, 150 Wn.2d at 483.

Zurich argues that Singh's bad faith claim impermissibly expanded Zurich's obligations under the insurance contract, citing Badgett v. Sec. State

---

7 Brief of Appellant at 4.

Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991) ("The duty of good faith does not extend to obligate a party to accept a material change in the terms of its contract.") The insurance contract stated that Zurich had the right to investigate and settle any claim as it deemed appropriate. Zurich reasons that its conduct could not have been in bad faith because the contract contained no provision limiting its right to exhaust policy limits with the Beckwith settlement.

Zurich cites Tyler v. Grange Insurance Association, 3 Wn. App. 167, 172, 473 P.2d 193 (1970), where this court held that the "typical liability insurance policy . . . gives the company control over the defense of the claim and control over the decision concerning opportunities of settlement within policy coverage." Tyler, 3 Wn. App. at 172. However, an insurer's right of control over settlement is not without limits. The insurer must "give consideration to the interests of the insured, when negotiating a settlement." Tyler, 3 Wn. App. at 172. An insurer "cannot put its financial interest before the interest of its insured; for an insurer to do so is to act in bad faith." Mut. of Enumclaw Ins. Co. v. T&G Constr., Inc., 165 Wn.2d 255, 269, 199 P.3d 376 (2008). Rather, an insurer must give equal consideration to the insured's interests. Safeco Ins. Co. of Am. v. Butler, 118 Wn.2d 383, 389, 823 P.2d 499 (1992). "The insurer is not free to proceed through negotiation and defense stages of litigation safeguarding only its own interests and neglecting those of its insureds." Weber v. Biddle, 4 Wn. App. 519, 525, 483 P.2d 155 (1971).

Zurich contends that insurers are entitled to rely on contractual language to cap their exposure and they are not required to defend every lawsuit, despite

the benefits that might bring to the insured. Zurich cites <u>Weyerhaeuser Co. v. Commercial Union Insurance Co.</u>, 142 Wn.2d 654, 692, 15 P.3d 115 (2000), and <u>Perez Trucking, Inc. v. Ryder Truck Rental, Inc.</u>, 76 Wn. App. 223, 233, 886 P.2d 196 (1994). In <u>Weyerhaeuser</u>, the court stated that "the underlying insurer's duty to defend ceases once its policy has been exhausted by payments made for this purpose." <u>Weyerhaeuser</u> and <u>Perez Trucking</u> involve the contractual allocation of defense responsibilities between two different insurers. Because they do not involve a claim of bad faith, they do not control the issue here.

"The insurer's duty to defend the insured is one of the main benefits of the insurance contract." <u>Butler</u>, 118 Wn.2d at 392. "The duty to defend is broader than the duty to indemnify because it is antecedent to and independent of the duty to indemnify." <u>Viking Ins. Co. of Wisc. v. Hill</u>, 57 Wn. App. 341, 346-47, 787 P.2d 1385 (1990). "Thus, while the policy may specifically provide for termination of the duty to defend upon payment of the policy limits, public policy requires the insurer to act in good faith in the interest of the insured." <u>Viking</u>, 57 Wn. App. at 349. A breach of the duty of good faith results in a cause of action "which arises from the contract *and* the fiduciary relationship." <u>Butler</u>, 118 Wn.2d at 393 (emphasis added). Courts "cannot focus solely on the contract aspect of that relationship." <u>Butler</u>, 118 Wn.2d at 394.

We conclude there is no bright-line rule absolutely excusing an insurer from its duty to defend once coverage is exhausted in an excess exposure case involving multiple claimants. The existence of bad faith "requires us to set aside traditional rules regarding harm and contract damages because insurance

contracts are different." Kirk v. Mt. Airy Ins. Co., 134 Wn.2d 558, 562, 951 P.2d 1124 (1998). If the insurer acted in bad faith when negotiating a settlement that exhausted the policy limits, the insurer cannot then use the exhaustion of policy limits as the basis for denying defense coverage. Even when the contractual language is unambiguous, there may still be a valid concern that the insurer has attempted to circumvent its duty to defend by making an early escape from the litigation. Pareti v. Sentry Indem. Co., 536 So. 2d 417, 423 (La. 1988).

At trial, Singh presented evidence that Zurich placed its own interest above his when it settled the Beckwith claim. The evidence included testimony by a witness, Gerald Hartmann, who had nearly 40 years of experience working for another insurance company, primarily with high-end casualty claims. A core portion of his testimony was that Zurich should have explored the option of a holdback when negotiating the Beckwith settlement. Hartmann's review of Zurich's files convinced him that the reason Zurich rejected Roessler's proposal of a $1,000 contribution by Singh for the Beckwith settlement was to avoid having to create a reserve for defense costs for non-Beckwith claims.

Hartmann testified that he was familiar with generally accepted standards for the investigation of claims and the negotiation of settlements in Washington. In his opinion, Zurich did not conduct an adequate investigation of the non-Beckwith claims. In particular, although Zurich knew Sykes intended to make a claim, Zurich did not independently investigate the potential value of that claim in relation to the value of the Beckwith claim and instead hastened to offer the entire limits to satisfy the Beckwith claimants. Hartman testified that even though

the Beckwith claim by itself was clearly worth more than the limits, it was reasonable to expect the Beckwith claimants to settle "somewhat south of the policy limits," RP 317, knowing there were other claims and other people Zurich had to consider. He said that rejecting Roessler's proposal did not comply with generally accepted claims handling standards. He testified that insurers are bound to use good faith when exercising a policy right to terminate the duty of defense when the limits have been exhausted by a judgment or settlement, and in his opinion Zurich's use of that clause in its policy was not in good faith.

Roessler testified that Zurich's rejection of his $1,000 contributions was not in Singh's best interest. "That's a tough question, but I would have to say no. That's the reason that we recommended that Zurich go for it. . . . So them saying no, I can't say that that served the best interests of my client."[8]  Roessler, Zurich's claims supervisor Tonya Truitt, and Zurich's claim manager Robert Reynolds, all struggled to provide an explanation for why Zurich declined Singh's offer to contribute $1,000 to the Beckwith settlement. The Beckwith claimants had agreed to a $100,000 holdback from the $2 million policy limits contributed by Alaska National, Gilliardi's insurer, so it is reasonable to infer that they would have accepted a similar arrangement with Zurich.

Zurich's claims file included an e-mail from Truitt to Roessler requesting an updated matrix of the claimants and their damages so that Zurich could obtain a current picture of its exposure for Singh's potential liability to non-Beckwith claimants. Truitt's e-mail was sent days before Zurich settled with Beckwith.

---

[8] Report of Proceedings (Dec. 15, 2016) at 52.

Singh argued this information was unnecessary to Zurich's evaluation of the Beckwith claim and was sought by Zurich only to determine what defense costs it could expect if the settlement did not completely exhaust Singh's policy limits.

The evidence described above supports Singh's theory that Zurich could have negotiated a settlement of the Beckwith claim that did not leave him undefended if other claimants like Sykes came forward later. It is sufficient to support the jury's finding that Zurich failed to act in good faith.

Zurich argues that holding back a small amount of coverage would not have made a difference. Like any other tort, a bad faith claim requires damages proximately caused by a breach of duty. Smith, 150 Wn.2d at 485. Zurich contends that if other potential claimants knew that Singh still had $1,000 in coverage left after the Beckwith settlement, they would have come forward and demanded it, exhausting the limits before Sykes filed his lawsuit. Thus, Zurich argues that Singh cannot show proximate cause. The argument is unconvincing. Gilliardi held back $100,000 in coverage, yet was sued by no one except the Beckwith parties. If Zurich had held back a mere $1,000 in coverage as Roessler proposed, it is speculative to assume that one of the other potential claimants would have gone to the trouble of suing Singh in order to get it. In fact, the continuing defense paid for by Zurich up to the point of the Sykes suit did have the effect of "shooing off" other potential claimants and arguably would have discouraged Sykes as well.

When the evidence is viewed in the light most favorable to Singh, it raises a question of material fact as to whether Zurich considered Singh's interest

11

equally with its own when negotiating the Beckwith settlement and, if not, whether its failure to do so damaged Singh. We conclude the trial court did not err in refusing Zurich's various requests to rule that Zurich acted in good faith as a matter of law.

We now turn to other errors alleged by Zurich.

<u>Admissibility of the Covenant Not To Execute</u>

Zurich contends that the trial court erred by excluding evidence of the stipulated covenant between Singh and Sykes. The covenant not to execute was part of the parties' settlement agreement. Under the covenant, Singh was personally liable to Sykes for $10,000 of the $250,000 settlement. Sykes' recovery of the remaining $240,000 was limited to Singh's proceeds from his bad faith action against Zurich.

In a motion in limine, Zurich moved to have the covenant admitted on the grounds that it rebutted the $250,000 in presumptive damages by showing that Singh was personally liable for only $10,000. A trial court's rulings on motions in limine are reviewed for abuse of discretion. <u>Gammon v. Clark Equip. Co.</u>, 38 Wn. App. 274, 286, 686 P.2d 1102 (1984), <u>aff'd</u>, 104 Wn.2d 613, 707 P.2d 685 (1985).

When an insurer denies coverage in bad faith, a reasonable settlement between the insured and injured party is the presumed measure of damages. <u>Besel v. Viking Ins. Co. of Wis.</u>, 146 Wn.2d 730, 738, 49 P.3d 887 (2002). Under <u>Besel</u>, the measure of presumptive damages is the total settlement, not the amount for which an insured is personally liable. A covenant not to execute does

12

not mean the insured was not harmed. Besel, 146 Wn.2d at 737. The trial court correctly ruled that under Besel, the damages of $250,000 were presumed; the covenant was not admissible to support an argument that the damages were only $10,000.

Zurich argues that the settlement was relevant to show collusion between Singh and Sykes. The trial court correctly ruled that Zurich had already litigated that issue and lost. At the earlier reasonableness hearing, the court found no evidence of collusion or bad faith in reaching the settlement.

Privileged Attorney-Client Communications

Zurich moved in limine for in camera review and admission of communications between Singh and his attorney, Roessler. The trial court denied this motion on the basis of the attorney-client privilege. Zurich contends that Singh waived the privilege.

Zurich's claim is rooted in Singh's answer to an interrogatory in which he claimed he was surprised when Zurich settled the Beckwith claim for full policy limits without notifying or consulting him:

> Zurich's decision to offer my full policy limits came as a shock to me because Zurich knew I was facing additional claims and because the decision was made without consultation, notification, or even advising me that Zurich had received something that it considered a policy limits demand . . . .
> . . . Zurich did not even attempt settlement negotiations with the Beckwith plaintiffs. Rather, it promptly decided to tender my full policy limits to the Beckwith plaintiffs without seeking input (or even informing) either me or my attorney of its decision.

Singh submitted the interrogatory answer on July 27, 2016. Zurich claims the credibility of the answer was undermined by an e-mail Roessler sent to Singh on

September 13, 2013. The e-mail was inadvertently disclosed in Hartmann's expert report. According to Zurich, Singh's interrogatory answer falsely implied that before the Beckwith settlement, he did not know what was being done in his defense and no one informed him that settling with Beckwith for the full policy limits could eliminate Zurich's duty to defend him from future claims. Zurich's motion sought to admit the e-mail at trial to show that Singh *was* informed about the pros and cons of the Beckwith settlement.

The trial court ruled that the communications were privileged "and may not be introduced or discussed in front of the jury unless Mr. Singh opens the door to these communications." Because Zurich does not identify any point in the trial where the trial court was asked to revisit the issue and rule that the door had been opened, Zurich has not preserved the alleged error as a ground for reversal. Instead, Zurich asks that if this case is remanded for a new trial, it should be with instructions to put the privileged e-mail before the jury and allow Zurich to obtain discovery of related communications between Singh and Roessler. Because we are not remanding for a new trial, there is no need to address this issue.

Motion To Exclude Expert Testimony

Zurich moved in limine to exclude Hartmann's testimony on the ground that it would "add little probative evidence," that it would "usurp the Court's role of instructing the jury about applicable law," and that Hartmann's opinions amounted to incorrect legal opinions. Zurich contends the trial court erred by denying the motion.

14

Trial courts "are afforded wide discretion and trial court expert opinion decisions will not be disturbed on appeal absent an abuse of such discretion." Johnston-Forbes v. Matsunaga, 181 Wn.2d 346, 352, 333 P.3d 388 (2014). Zurich contends the admission of Hartmann's opinions should be reviewed de novo because they misrepresented Washington law and the language of Singh's policy. We see nothing in Hartmann's testimony that calls for de novo review.

Zurich cites the rule that expert testimony must have a factual basis. Davidson v. Mun. of Metro. Seattle, 43 Wn. App. 569, 578, 719 P.2d 569, review denied, 106 Wn.2d 1009 (1986). In Davidson, the expert witness reached his opinion by assuming facts conflicting with eyewitness testimony and drawing inferences from facts not in evidence. Davidson, 43 Wn. App. at 575. Unlike the expert in Davidson, Hartmann did not base his opinion on unsupported facts. Hartmann was qualified to discuss industry practice by his 40 years of experience working on high damage insurance claims. An expert may be qualified to testify by experience alone. Taylor v. Bell, 185 Wn. App. 270, 285, 340 P.3d 951 (2014), review denied, 183 Wn.2d 1012 (2015).

In Hartmann's opinion, when Zurich settled the Beckwith claim in a way that left Singh on his own to defend against Sykes, Zurich was putting its own interest ahead of Singh's. Zurich could have accepted Roessler's proposal to let Singh contribute $1,000 to the Beckwith settlement or could have considered a holdback like the one the Beckwith claimants agreed to with Gilliardi. Hartmann's review of the claims file and other documents convinced him that Zurich decided to pay full policy limits with the intention of cutting off its responsibility to cover

15

Singh's defense costs. The trial court did not abuse its discretion in allowing Hartmann to state this opinion. Zurich was able to cross-examine Hartmann and to present a different expert witness, David Mandt, who disagreed with virtually everything Hartmann said.

In a related argument pertaining to the negligence claim, Zurich contends Hartmann did not specify the standard of care in the insurance industry, and the trial court erred by not providing a standard of care in the negligence instructions.

In highly technical or specialized cases like medical and legal malpractice, a plaintiff is ordinarily required to present expert testimony setting forth an industry specific standard of care. See, e.g., Geer v. Tonnon, 137 Wn. App. 838, 851, 155 P.3d 163 (2007), review denied, 162 Wn.2d 1018 (2008). Zurich does not argue that an insurance company's duty to defend is so technical that it is beyond the knowledge of the ordinary person. Hartmann testified in terms of generally accepted claims handling standards. His testimony was helpful to explain why an insurance company must use care when conducting settlement negotiations in an excess exposure situation with multiple claimants. He placed Zurich's alleged negligence in the context of state regulations that generally define an insurance company's obligations when communicating with the insured and when investigating and settling a claim.

The jury was given pattern instructions defining negligence and stating that the standard of care is ordinary care. Zurich did not object to these instructions or propose anything additional. We find no error in the presentation of the negligence claim.

16

Jury Question

Zurich argues that the trial court erred in its answer to a question from the jury. The question was whether jurors "all have to agree on the *specifics* of the contract breach or do we all have to agree simply that the contract was breached even if we believe that the contract was breached for different reasons?" The court responded that "ten jurors must agree upon the answer to any question on the special verdict form."

On appeal, Zurich argues that the court should have identified how Zurich breached the contract. As there is no indication in the record that Zurich objected to the court's response at the time, the argument is waived. Millies v. LandAmerica Transnation, 185 Wn.2d 302, 310, 372 P.3d 111 (2016).

Presumption of Damages

The trial court instructed the jury to award $250,000—the amount of Singh's settlement with Singh—if it found that Zurich breached its duty of good faith. Zurich argues that instructing the jury to award presumed damages violated its due process rights. Zurich contends that the jury should be responsible for determining damages as is done in other cases.

It is well settled that a settlement including a covenant not to execute will serve as the measure of damages in a bad faith case if the amount of the settlement has been determined to be reasonable. It is not unconstitutional to have a judge rather than a jury make that determination  Bird, 175 Wn.2d at 767-68. Zurich has not meaningfully distinguished the present case from Bird.

17

Following Bird and its predecessors, we conclude the jury was properly instructed to award $250,000 if it found Zurich breached its duty of good faith.

Emotional Distress Damages

The jury awarded Singh $5,000 for emotional distress. Zurich contends that emotional distress damages may not be awarded in an insurance bad faith action.

The Supreme Court affirmed a jury award of emotional distress damages for an insurer's bad faith in Coventry Associates v. American States Insurance Co., 136 Wn.2d 269, 284, 961 P.2d 933 (1998). This court similarly affirmed awards of emotional distress damages in Anderson v. State Farm Mutual Insurance Co., 101 Wn. App. 323, 333, 2 P.3d 1029 (2000), review denied, 142 Wn.2d 1017 (2001), and in Miller v. Kenny, 180 Wn. App. 772, 802, 325 P.3d 278 (2014). We reasoned that because bad faith is a tort, a plaintiff is not limited to economic damages. Anderson, 101 Wn. App. at 333.

Zurich contends that these cases must give way to the Supreme Court's more recent decision in Schmidt v. Coogan, 181 Wn.2d 661, 676, 335 P.3d 424 (2014). Schmidt was an appeal from a plaintiff's verdict in a legal malpractice case. The malpractice occurred when the defendant failed to file an amended complaint before the expiration of the statute of limitations. Schmidt, 181 Wn.2d at 663. The defendant was found liable, but the trial court held that emotional distress damages were not available. Schmidt, 181 Wn.2d at 664. The majority affirmed the trial court's ruling, holding that foreseeable damages for emotional distress were available in legal malpractice if the conduct was particularly

egregious or the representation was of a sensitive or personal nature, and the facts of the case did not meet these criteria. Schmidt, 181 Wn.2d at 674. A dissent argued that emotional distress damages should be made available in a legal malpractice action by analogy to bad faith cases like Coventry, Anderson, and Miller. Schmidt, 181 Wn.2d at 688-89 (Stephens, J., dissenting). Because those three cases "simply say that insurance bad faith is a tort" without further analysis and because "attorney malpractice differs considerably from insurer bad faith," the majority did not endorse the analogy. Schmidt, 181 Wn.2d at 676. However, the court did not hold that emotional distress damages are categorically unavailable in insurance bad faith claims. The court simply concluded, "The analogy between insurance bad faith and attorney malpractice must await a fuller exploration than either the dissent or the parties have offered." Schmidt, 181 Wn.2d at 677.

Since Schmidt, this court has again affirmed an award of emotional distress damages in a bad faith case. Mut. of Enumclaw Ins. Co. v. Myong Suk Day, 197 Wn. App. 753, 769, 393 P.3d 786, review denied, 188 Wn.2d 1016 (2017). Following Myong Suk Day as well as Coventry, Anderson, and Miller, we affirm the award of emotional distress damages.

Attorney Fees

The trial court found that Singh was entitled to an award of attorney fees under Olympic Steamship Co. v. Centennial Insurance Co., 117 Wn.2d 37, 811 P.2d 673 (1991). Zurich assigns error to this ruling.

19

An award of attorney fees "is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract." Olympic Steamship, 117 Wn.2d at 53. Entitlement to an award of fees under Olympic Steamship arises when an insurer wrongfully denies coverage, as distinguished from the situation where coverage is conceded but the claim fails or recovery is diminished on its factual merits. Greengo v. Pub. Emps. Mut. Ins. Co., 135 Wn.2d 799, 817, 959 P.2d 657 (1998).

Olympic Steamship does not apply if the only dispute is over the value of a claim. Dayton v. Farmers Ins. Grp., 124 Wn.2d 277, 280, 876 P.2d 896 (1994). Zurich contends Olympic Steamship also does not apply where, as here, the insurance company accepted coverage and paid the full policy limit. But because Zurich also has a duty to defend, paying the full policy limit is not equivalent to providing the full benefit of the insurance contract. We conclude the trial court properly awarded fees under Olympic Steamship. See Unigard Ins. Co. v. Mut. of Enumclaw Ins. Co., 160 Wn. App. 912, 928, 250 P.3d 121 (2011) (Olympic Steamship fees awarded because insurer refused in bad faith to defend its insured).

Zurich contends the court awarded an excessive amount. This court reviews the amount of an attorney fee award for abuse of discretion. Miller, 180 Wn. App. at 820. "Courts must take an *active* role in assessing the reasonableness of fee awards, rather than treating cost decisions as a litigation afterthought. Courts should not simply accept unquestioningly fee affidavits from

counsel." Mahler v. Szucs, 135 Wn.2d 398, 434-35, 957 P.2d 632, 966 P.2d 305 (1998).

Singh's attorney's affidavit claimed 792 hours devoted to the case by five attorneys, a law clerk, and a paralegal. The hourly rates for the attorneys ranged from $445.00 for lead counsel to $225.00 per hour for a first-year associate. With the addition of time spent responding to Zurich's supplemental briefing, the fee claim was for a total of $294,954.50. Singh requested a multiplier of 2.0 for high quality work and the contingent nature of the fee. He asked for an award of costs amounting to $17,792.63.

Zurich objected generally that the claimed fees showed overstaffing, duplicated effort, unproductive time spent on unsuccessful claims and on unfiled motions, and unreasonable hourly rates. Zurich objected to the request for a multiplier and opposed awarding costs. After having the opportunity to review billing records, Zurich filed a supplemental brief with more detailed objections and suggestions for where reductions could be made.

In response to Zurich's objections, the court made reductions totaling $19,019.00 and found the remaining $275,935.50 to be reasonable. The court awarded $17,774.73 in costs.[9] The court did not grant a multiplier.

On appeal, Zurich contends this is a case like Berryman v. Metcalf, 177 Wn. App. 644, 659, 312 P.3d 745 (2013), review denied, 179 Wn.2d 1026 (2014). It is not. In Berryman, the trial court awarded fees exactly as claimed by

_____

[9] Clerk's Papers at 3476-77 (Order Granting Plaintiff's Motion for Attorney Fees and Costs).

the plaintiff, including a multiplier, and rubber-stamped the plaintiff's proposed findings without addressing the defendant's detailed objections. The fee award was nearly $292,000 for a short trial de novo of a minor soft tissue injury case. There was "no indication that the trial judge actively and independently confronted the questions of what was a reasonable fee." Berryman, 177 Wn. App. at 658. Here, it is evident from the record that the court thoughtfully considered Zurich's objections and made appropriate reductions for duplicative and unproductive work.

Zurich faults the trial court's findings for not specifically addressing the reasonableness of Singh's hourly rates, block billing, unsuccessful claims which Singh failed to segregate when he could have, and "unsubstantiated expenses."[10] The record supports the trial court's finding that the hourly rates charged, ranging from $225 to $445, were reasonable. Singh's attorney provided a declaration stating his qualifications. He attached a survey of the hourly rates of plaintiff lawyers, showing that his hourly rate was within the range. He showed that his rate had been found reasonable in other cases.

Zurich claimed that Singh listed 183.2 hours in block billing, but Zurich did not provide the court with specific examples. Zurich argued that the court should deduct $39,492 for overstaffing because, like in Berryman, two attorneys attended the trial. But Zurich's argument did not take into consideration the greater complexity of a bad faith case. Zurich unreasonably identified any entry

---

[10] Brief of Appellant at 74.

where more than one attorney worked on an issue as an example of overstaffing or duplicative work.

Singh presented the time records of counsel in a lengthy table identifying the specific work performed, the hours spent, and the rate charged. These records satisfied the concerns identified in Berryman and gave the court a meaningful basis for evaluating the reasonableness of the time spent by Singh's attorneys. The court reduced the attorney fees by $8,000 for duplicative work and $360 for the cost of a law clerk to attend a four-hour mediation. These adjustments were within the court's broad discretion.

Zurich argued below for a reduction in hours to account for the fact that the jury found no CPA violation and no damages for the IFCA violation. Singh's billing records identified $2,646 for work done on those claims, and the trial court reduced the award by that amount. The trial court did not abuse its discretion by refusing Zurich's request for a more substantial reduction for these relatively insignificant claims, for which segregation would be difficult because they were closely related to the overarching claim of bad faith.

Zurich argues that the trial court should have reduced the award for time spent on Singh's breach of contract claim, which Zurich contends should be deemed unsuccessful even though the jury found that Zurich breached its contract with Singh. The basis of this argument is the trial court's decision to instruct the jury on breach of contract separately from breach of the duty of good faith. The trial court summarized its rulings on the issues pertaining to the jury

instructions in an order.[11] In the order, the court stated that Singh had "no viable cause of action for breach of contract *other* than his claim for a bad faith breach of contract." Zurich reasons that there is no such thing as a bad faith breach of contract in Washington because bad faith sounds in tort, and therefore Singh's attorneys wasted their time preparing and arguing their breach of contract theory. This argument lacks merit. The trial court was not ruling that there is only a tort cause of action. The trial court's order on jury instructions simply recognized that the breach of contract claim could not succeed unless there was a finding of bad faith on the part of Zurich and cited Kirk in support of its ruling.[12]

Zurich contends Singh failed to document his itemized list of costs. Singh provided records and invoices substantiating most of the items. It was not an abuse of discretion for the court to accept the list as support for the remaining undocumented items, which were for such things as court costs, production of trial exhibits, and copying.

We conclude the court gave an appropriate level of scrutiny to the claim for attorney fees and Zurich's objections to it, as required by Mahler and Berryman.

Olympic Steamship fees are available to parties prevailing on appeal. Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 148, 930 P.2d 288

---

[11] Clerk's Papers at 2459-62 (Order on Jury Instructions), Dec. 20, 2016.
[12] See also Report of Proceedings (Dec. 20, 2016) at 288 (in response to Zurich's objection to the breach of contract instruction, court stated, "I do believe that a breach of the implied duty of good faith in a contract is a contract-based claim".)

(1997). Singh is entitled to an award of appellate fees and expenses subject to compliance with RAP 18.1(d).

We affirm the judgment on the verdict and the award of attorney fees and costs.

Becker, J.

WE CONCUR:

Trickey, J

Appelwick, C.J.